JjPEATROSS, J.
This appeal arises out of the termination of Lula' Scott’s employment with the Oua-chita Parish School Board (“School Board”). As a result of her termination, Ms. Scott filed suit seeking reinstatement and damages. After a bench trial, the trial court awarded Ms. Scott unpaid wages until the date the School Board made the final decision to terminate her employment along with attorney fees in the amount of $1,500, but dismissed her claims regarding the circumstances of her termination and her request for penalty wages. Ms. Scott appeals, asserting six assignments of error. For the reasons stated herein, the judgment of the trial court is amended and, as amended, is affirmed.

FACTS

Ms. Scott was employed as a teacher’s aide at Ouachita High School (“Ouachita High”) during the 1993-1994 and 1994-1995 school years. Ouachita High is an alternative school for “behaviorally-challenged” young people. Ms. Scott had previously worked in the special education department at West Monroe High School, which is also an alternative school; but, as a result of problems with her performance at that school, she requested a transfer to Ouachita High after the 1992-1993 school year. Her first year at Ouachita High was uneventful. During her second year, however, questions arose regarding her performance. Ms. Scott was the teacher’s aide in the classroom of Donnie Dawson, a special education teacher. According to the testimony of Mr. Dawson, Ms. Scott had a recurring problem with tardiness and with *705 leaving school early in the afternoons. Mr. Dawson reported the tardiness to the supervisor of the special education department, Jimmy Wallace, as well as a physical altercation with another teacher’s aide in which Ms. Scott was allegedly involved. Several other problems with Ms. Scott’s behavior were reported to Mr. Wallace during the school year, including one incident where Ms. Scott allegedly struck a student.
pMr. Dawson also testified that, when end-of-the-year evaluations were due, he approached Mr. Wallace with concerns about Ms. Scott. At the end of the school year, the major incident which precipitated Ms. Scott’s termination occurred. Students were to go on a field trip to the campus of Northeast Louisiana University (“NLU”) and Ms. Scott was to assist as a chaperone. Several witnesses testified regarding the facts surrounding the occurrence at NLU. On the morning of the trip, Ms. Scott did not get on the bus and told Mr. Wallace that she did not want to go with the group. When Mr. Wallace insisted, Ms. Scott, with Mr. Wallace’s permission, drove her personal vehicle to meet the group at NLU. While eating lunch, apparently one of the students reached for an ice cream cone that Ms. Scott was eating which enraged her to the point of her raising her voice and causing a disturbance. After the incident, Ms. Scott left NLU and returned to Ouachita High. Ms. Scott provided a contrary version of events and testified that the incident was a “humorous” situation which she did not believe to be a problem or disturbance at all.
After returning to the school, the incident was reported to the principal, Gary Armstrong. Mr. Wallace and Principal Armstrong discussed the situation with Ms. Scott and agreed that Ms. Scott should be terminated. Principal Armstrong testified that he believed Ms. Scott may not be back the following fall; so, instead of recommending immediate termination, he chose to wait and see if formal action would be required. Shortly before the beginning of the next school year, Principal Armstrong spoke with Ms. Scott to determine her plans. When Ms. Scott informed him that she was planning to return as an aide to Ouachita High, Principal Armstrong testified that he requested that she come to his office for a conference. According to Principal Armstrong, the two discussed at the meeting the problems with Ms. Scott’s performance during the previous year, ^including the incident at NLU. Principal Armstrong further testified that, at that meeting, Ms. Scott offered no defense or explanation, only a flat denial of all allegations. Principal Armstrong then advised Ms. Scott that he was going to recommend her termination.
On August 4, 1995, Principal Armstrong sent a letter to Lanny Johnson, Superintendent of the School Board, recommending that Ms. Scott be terminated. The August 4th letter contained the reasons for Principal Armstrong’s recommendation, stating that Ms. Scott had exhibited both unprofessional and inappropriate behavior. Superintendent Johnson then advised Ms. Scott of the situation by letter dated August 7th, to which he attached a copy of Principal Armstrong’s August 4th letter recommending her termination. The August 7th letter also advised Ms. Scott that a conference had been scheduled for August 11th to discuss Ms. Scott’s status. Ms. Scott received the letter from Superintendent Johnson on August 9, 1995. Present at the meeting were Ms. Scott; her counsel; Superintendent Johnson; Principal Armstrong; Mr. Wallace; Dr. Frank Hoffman, Personnel Director of the School Board; and Mr. Larry Young, Supervisor of the Special Education Aides, who had been involved in the problems Ms. Scott experienced at West Monroe High. Mr. Dawson, however, was not present at the meeting.
In anticipation of the meeting, Ms. Scott had Mr. Dawson and two other teachers sign statements which expressed the opinion that at no time during the school year was Ms. Scott’s behavior unprofessional, *706 uncooperative or unpleasant. These “To Whom it May Concern” letters were signed on August 10, 1995.[1] Ms. Scott presented these documents at the conference; but, when Upresented the opportunity to rebut allegations of misconduct, she simply denied all allegations. Ms. Scott’s counsel was not allowed to participate in the conference; however, he was allowed to advise Ms. Scott regarding her responses and comments.
Following the conference, Superintendent Johnson determined that dismissal was appropriate and, by letter dated August 14th, gave Ms. Scott the opportunity to resign by August 18th. This letter also informed Ms. Scott that, if she chose not to resign, Superintendent Johnson intended to proceed with his recommendation that her employment be terminated. Ms. Scott chose not to resign.
Pursuant to Superintendent Johnson’s recommendation, the matter of Ms. Scott’s termination was placed on the agenda of the next meeting of the School Board to be held on September 12, 1995. According to Superintendent Johnson’s deposition testimony, Ms. Scott’s counsel had requested in writing, prior to the meeting, that he be afforded the opportunity to address the School Board in order that he might persuade the School Board to vote to conduct an open hearing on the matter. Again, at the meeting, Ms. Scott’s counsel made an oral request for permission to address the School Board After some discussion, the School Board declined counsel’s request and voted to adopt Superintendent Johnson’s recommendation to terminate Ms. Scott. Ms. Scott was advised by letter dated September 14, 1995, of the School Board’s action and that her effective date of termination was August 18, 1995. Ms. Scott was paid through August 18th; however, the School Board denied her request for payment of wages through September 12,1995.

1,ACTION OF THE TRIAL COURT

As previously stated, Ms. Scott filed suit against the School Board and the trial court awarded her unpaid wages through September 12, 1995, but dismissed all other claims. Specifically, the trial court found that Ms. Scott, as a non-tenured employee, did not have a constitutionally protected property interest in her continued employment. As such, the process to which Ms. Scott was entitled was that which was provided to all non-tenured employees of the School Board pursuant to the School Board’s policy regarding the termination of such employees. In so finding, the trial court relied on the decision of this court in Harris v. West Carroll Parish School Board, 605 So.2d 610 (La.App. 2d Cir.1992), writ denied, 609 So.2d 255 (La.1992).
After determining that Ms. Scott was not entitled to constitutional due process because of her status as a non-tenured employee, the trial court further found that the School Board had substantially complied with its policy regarding termination of non-tenured employees with regard to Ms. Scott and, therefore, dismissed Ms. Scott’s claims. The trial court did, however, find that, since Ms. Scott’s actual termination was not approved by the School Board until the September 12, 1995 meeting, she was entitled to unpaid wages until that date, along with attorney fees in the amount of $1,500. The School Board has not appealed that ruling. Finally, finding no intentional withholding of pay or bad faith on the part of the School Board in failing to pay Ms. Scott for that time period, her request for penalty wages was denied.

DISCUSSION

Due Process

Ms. Scott’s primary argument on appeal concerns the constitutionality of the School *707 Board’s actions regarding her termination; and, therefore, we begin our |fidiscussion with that issue. Ms. Scott claims that she had a constitutionally protected property interest in her continued employment and to deprive her of that interest without affording her an “opportunity to be heard” constitutes a denial of due process under the United States and Louisiana Constitutions. Under the School Board’s policy, an employee may only be terminated for “just cause,” which, according to Ms. Scott, creates a “definable and defensible” interest in her employment.[2] In support of her argument, Ms. Scott relies on La. R.S. 17:81.5, which provides as follows:
§ 81.5. School employees; procedure for dismissal
Not later than January 1, 1988, each city and parish school board shall develop and adopt rules and policies which it shall use in dismissing school employees who have not attained tenure in accordance with applicable provisions of law and whose dismissal is not a result of a reduction in force, as provided for in R.S. 17:81.4. The school board shall provide a procedure by which any employee, whose dismissal is governed by this Section, may participate in the development of the rules and policies. Such rules and policies shall be made available for public inspection within ten days after they are finally adopted.
In December 1987, as required by La. R.S. 17:81.5, the School Board adopted a policy for the termination of non-tenured employees, which provides, in pertinent part:
Whenever the dismissal for cause of a non-tenured employee is being considered, the following steps shall be taken:
(1)The employee’s immediate supervisor, or other person recommending his dismissal shall discuss the reason therefore [sic] with the principal of the school where the employee works, or if the employee is not housed at a particular school, with the department |7head under whom the employee works (i.e., director of maintenance, director transportation, director of finance, etc.).
(2) If the principal or department head feels that dismissal is appropriate, then he shall make a written recommendation to the superintendent or his designee outlining the reasons for the recommendation. The employee shall be provided a copy of each recommendation.
(3) The superintendent or his designee shall thereafter conduct a conference with the principal or department head, the employee, and the employee’s immediate supervisor (if other than principal or department head). Those recommending the dismissal of the employee shall be asked therein to explain their reasons for such recommendation, and the employee shall be given the opportunity to rebut those reasons and/or to explain his position. The conference may be recessed if the superintendent or his designee feels that additional information is needed before a decision can be made.
(4) If, after considering the information presented in the conference and any other information considered important, the superintendent or his designee feels that dismissal is appropriate, then the employee shall be advised of the staff-level determination and shall be given the opportunity to resign and/or retire.
(5) If the employee does not exercise his opportunity to resign and/or retire, then the superintendent or his designee shall make a written recommendation of dismissal to the school board. The recom *708 mendation shall outline the reasons therefore [sic], and a copy of it shall be provided to the employee.
(6) The school board will be asked to act upon the recommended dismissal at the next meeting following receipt of such written recommendation.
(7) A nontenured employee who has been recommended to the board for dismissal shall not be entitled to a hearing before the board, unless a majority of the members vote to afford one.
As previously stated, Ms. Scott claims that La. R.S. 17:81.5 creates a constitutionally protected property interest in her employment, in excess of the protection afforded under the School Board’s policy. Further, she claims that the trial court’s reliance on Harris, supra, was misplaced. We disagree.
Initially, we note that our review of the trial court’s determination is governed by the manifest error/clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989); Harris, supra. Next, we agree with the trial court that Harris, supra, is entirely dispositive of this issue. In Harris, a cafeteria worker who, pursuant to La. R.S. 17:82[3], was a non-tenured employee of the West Carroll Parish School Board, was terminated for insubordination. Harris filed suit alleging denial of due process because she was not afforded a full eviden-tiary hearing prior to her termination. A panel of this court specifically held that “[a]s a non-tenured employee, Harris had no state or federally protected property interest in continued employment ... [t]he only rights to which Harris was entitled were those set forth in the procedure promulgated by the West Carroll Parish School Board previously discussed in this opinion.” (Emphasis ours.) Ms. Scott argues that, because the court in Harris cited La. R.S. 17:82 in its holding, the case is inapplicable. We find no merit to this argument. La. R.S. 17:82 was clearly cited for the purpose of establishing that the plaintiff in Harris was, in fact, a nontenured employee and, as such, was not entitled to constitutional protection regarding her continued employment. We believe that is the only reason that La. R.S. 17:82 was cited and that this court’s reference to that statute certainly does not render the case inapplicable to other cases involving non-tenured employees. To the contrary, the holding of the case clearly addresses the class of employees who are non-tenured as opposed to tenured.
Finally, Harris also disposes of Ms. Scott’s argument that the “just cause” requirement for termination of a school board employee necessarily creates a | ^property interest in continued employment, carrying with it the guarantee of constitutional due process. Harris specifically held to the contrary. Based on Harris, we find that Ms. Scott, as a nontenured employee, did not have a constitutionally protected property interest in her continued employment and, therefore, was not entitled to due process over and above that provided by the School Board’s policy.
Next, Ms. Scott asserts that La. R.S. 17:81.8 grants all employees, whether tenured or not, the right to a hearing before their respective school board in the event the employee is disciplined. That statute reads as follows:
§ 81.8. Employee demotion; investigation
A. By not later than January 1,1993, each city and parish school board shall adopt and implement a policy establishing procedures for the investigation of any employee in any case in which there is a public announce *709 ment by the board that the employee may be disciplined whether or not there is an accompanying reduction in employee pay. The policy shall include a process by which any such employee, if the employee so determines, not later than thirty days after the conclusion of such investigation and prior to any school board action, may appear before the school board in open session and be given a reasonable time, as determined by the board, to comment on the investigation and any actions taken or proposed to be taken involving the employee. (Emphasis ours.)
Since the School Board had not adopted a policy pursuant to the above section at the time of her termination, Ms. Scott claims that she should have been afforded a hearing. We note that, on April 2, 1996, albeit subsequent to Ms. Scott’s termination, the School Board did adopt a policy pursuant to La. R.S. 17:81.8. That policy makes clear that the School Board interprets the statute, as its title implies, to apply only to employee demotions. The trial court also found that to be the case, holding that La. R.S. 17:81.8 was inapplicable to the present case. WeJ^agree with the trial court that the statute is not applicable to employee termination proceedings.
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be interpreted as written. No further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9. When the language of a law is susceptible to different meanings, the law must be interpreted as having the meaning which best conforms to the purpose of the law. La. C.C. art. 10. Laws on the same subject are to be interpreted in reference to each other. La. C.C. art. 13.
In Theriot v. Midland Risk Insurance Co., 95-2895 (La.5/20/97), 694 So.2d 184, the supreme court explained that the function of statutory interpretation rests with the judicial branch of the government. The starting point in interpretation is the language of the statute itself. Where a part of an act is to be interpreted, it should be read in connection with the rest of the act and all other related laws on the same subject. Theriot, supra.
The paramount consideration in interpreting a statute is ascertaining the legislature’s intent and the reasons that prompted the legislature to enact the law. Legislative intent is the fundamental question in all cases of statutory interpretation; rules of statutory construction are designed to ascertain and enforce the intent of the statute. When reasonably possible, all acts on a subject are to be harmonized. Theriot, supra.
In our view, § 81.8 clearly addresses a situation in which there has been a public announcement of a school board’s plan to discipline an employee. In fact, the plain language of its title indicates that the provision concerns employee demotions and investigations. According to the statute, a public announcement of such discipline triggers a right of that employee to a hearing before the school Inboard. This circumstance is separate and distinct from the routine situation concerning termination of non-tenured employees. We do not find either La. R.S. 17:81.5 or 17:81.8 to be ambiguous. Each clearly applies to a distinct factual circumstance.
Simply put, in the case sub judice, there was no prior public announcement that Ms. Scott was going to be disciplined, or demoted, by the School Board; rather, this case falls within the routine procedure for termination of a non-tenured employee, which is specifically set forth in the School Board’s policy, as required by La. R.S. 17:81.5. Since we find that La. R.S. 17:81.8 is inapplicable to such routine termination procedures, we further find it to be inapplicable to this case.
Additionally, we note that, as previously mentioned, the legislature’s intent *710 in fashioning these provisions was to afford the non-tenured employee with a status higher than that of an “at will” employee. Rather than granting such non-tenured employees protection of full constitutional procedural due process, the legislature chose to allow the individual school boards the discretion to adopt individual policies to deal with the termination procedures of such employees. We do not believe it was the intent of the legislature that § 81.8 be interpreted to afford all employees being disciplined by a school board, even if the discipline itself occurs at a meeting of the school board, the right to notice and opportunity to be heard, i.e., a full evidentia-ry hearing. If that were the case, there would be no need for the procedures required of the individual school boards by § 81.5. This comports with the rules of statutory construction. If two statutes can be reconciled by a fair and reasonable interpretation, it must be done. Hayden v. Richland Parish School Board, 554 So.2d 164 (La.App. 2d Cir.1989), writ denied, 559 So.2d 124 (La.1990).
h-We further find that the cases cited by Ms. Scott are distinguishable and, therefore, not applicable to the circumstances in the present case. In Cowart v. Lee, 626 So.2d 93 (La.App. 3d Cir.1993), a nontenured employee was terminated by the Concordia Palish School Board. The third circuit held that the plaintiff in Cowart should have been afforded constitutional due process during the termination proceedings. That holding, however, was based on the Concordia Parish School Board’s failure to adopt the procedures by which non-tenured employees would be terminated as mandated by La. R.S. 17:81.5. Since the school board had failed to provide any such “process” in accordance with the legislature’s intention to afford school board employees something more than “at will” status, the court in Coiuart afforded the terminated employee those due process rights guaranteed by the Louisiana and United States Constitutions. In so doing, the Cowart court stated:
In enacting LSA-R.S. 17:81.5, the people of this state, represented by the legislature, purposefully sought to remove nontenured school employees from the category of “at will” employees, and in doing so, limited the authority of school boards and their superintendents to hire and fire nontenured, nonteaching personnel without regard to the rights of employees so affected.... [The School Board] cannot now claim, in light of the allegations made and accepted as true, that nontenured nonteaching school personnel cannot avail themselves of the rights they, and through them, the taxpayer, were given by express statute, solely as a consequence of the school board’s apparent disregard for the legislation. (Internal citations omitted.)
Since the School Board in the case sub judice complied with the mandate of La. R.S. 17:81.5 in adopting the policies by which Ms. Scott was terminated, we find Cowart inapplicable.
Likewise, we find Samuel v. Holmes, 138 F.3d 173 (5th Cir.1998) distinguishable on its facts. The plaintiff in Samuel was a probationary employee with the Orleans Parish School Board. Pursuant to La. R.S. 17:522, such employees may be terminated upon the “written recommendation of the | ^superintendent, accompanied by valid reasons therefor.” The Orleans Parish School Board adopted a policy providing a three-tiered review process for the termination of probationary employees which, ás the third step, included a full evidentiary hearing. In Samuel, the Orleans Parish School Board completely failed to comply with steps 1 and 2 of its policy. In finding that Samuel did have a protected property interest in continued employment, the fifth circuit concluded that the Orleans Parish School Board must also have thought that such probationary employees had a property interest in continued employment as evidenced by its adoption of the policy affording such employees a full evidentiary hearing. Our *711 case is clearly distinguishable from the situation in Samuel.
In accordance with Harris, supra, we, therefore, find that the process that was due Ms. Scott was the process afforded non-tenured employees under the School Board’s policy. We now turn to the issue of whether or not the School Board substantially complied with that policy in its termination of Ms. Scott.

Compliance with the School Board’s Policy

All parties agree that the standard by which the School Board’s actions are to be judged is substantial compliance. See Harris, supra. Additionally, the trial court must afford great deference to the findings of the School Board. In Harris, supra, we explained:
The Louisiana Constitution and legislature entrust the administration of the school system to the parish school boards and not to the courts. The School Board is vested with broad discretion in the administration of the school system, nevertheless, due process requires judicial review to ensure that the school boards do not abuse this discretion. But that review is limited, and where there is a rational basis, which is supported by substantial evidence for the school board’s discretionary determination, the courts cannot and should not substitute their judgment for that of the school board. (Internal citations omitted).
|14See also McKenzie v. Webster Parish School Board, 26,713 (La.App.2d Cir.4/5/95), 653 So.2d 215, writ denied, 95-1415 (La.9/22/95), 660 So.2d 472. In addition to the deference given the School Board by the trial court, as previously stated, this court may not set aside the findings of the trial court absent manifest error. Rosell, supra; Harris, supra.
Referring back to the policy as quoted earlier in this opinion, we first find that the School Board complied with Step 1. Both Mr. Dawson and Mr. Wallace spoke with Principal Armstrong, regarding Ms. Scott’s performance. Subsequently, Principal Armstrong brought a recommendation of dismissal to Superintendent Johnson. Following the previously described incident at NLU, Mr. Wallace and Principal Armstrong specifically discussed the termination of Ms. Scott and the reasons in support thereof.
Next, we find that the School Board substantially complied with Step 2. Principal Armstrong wrote a letter to Superintendent Johnson in which he stated “there were several occasions reported to Mr. Wallace (Special Ed. Coordinator) and myself concerning unprofessional and inappropriate behavior [of Ms. Scott] to both students and other faculty members. Teachers and Aides in the Special Ed. Department have found her to be un-coop-erative and unpleasant.” We believe that this letter adequately states the reasons for Principal Armstrong’s recommendation that Ms. Scott be terminated. This finding is buttressed by the fact that Principal Armstrong had previously conducted a meeting on August 4th with Ms. Scott during which he discussed with her the specific details and occurrences of alleged misconduct. We believe, therefore, that Ms. Scott had knowledge of the specific reasons for her termination. While Principal Armstrong’s letter could have been more specific, we conclude that it constitutes 1 ^substantial compliance with Step 2 of the policy. Finally, we note that Ms. Scott was provided a copy of Principal Armstrong’s letter.
We also find that the School Board substantially complied with Step 3. A conference was held on August 11th. Ms. Scott complains that Mr. Dawson, whom she asserts was her immediate supervisor, was not present at the meeting as required by the School Board’s policy. While we agree that the better practice would have been to have had Mr. Dawson present at the conference, we do not find the lack of his presence fatal to compliance with Step 3. First, the policy requires the presence of *712 the employee’s immediate supervisor “if other than principal or department head.” There seems to be some question as to whether Mr. Dawson or Mr. Wallace, the supervisor of special education department, was actually Ms. Scott’s supervisor. Mr. Wallace was present at the conference, as was Principal Armstrong. We find that the presence of Mr. Wallace and Principal Armstrong constitutes substantial compliance with regard to the required attendees of the conference under Step S. Second, during that conference, Ms. Scott was presented with the recommendation of the principal that she be terminated. She was given the opportunity to respond to the recommendation; but, as in the previous meeting with Principal Armstrong, she simply denied all allegations. We note that, despite the fact that the policy does not provide for the presence of the employee’s counsel, Ms. Scott’s attorney was allowed to attend the conference.
We also find compliance with Step A Following the August 11th conference, Ms. Scott was informed by letter from Superintendent Johnson, dated August 14th, of her opportunity to resign. She was given until August 18th to make a decision regarding her resignation and, ultimately, chose not to do so. The letter of August 14th specifically informed Ms. Scott that, if she chose not to h (¡resign, Superintendent Johnson was going to recommend her termination. Also attached to that letter was a copy of Principal Armstrong’s letter recommending her termination to Superintendent Johnson.
Regarding Step 5, we find substantial compliance on the part of Superintendent Johnson. Once Ms. Scott declined to resign and Superintendent Johnson had decided to make the recommendation of termination to the School Board, he forwarded Principal Armstrong’s letter recommending her termination to the School Board. While he did not compose a separate piece of correspondence outlining the reasons for his recommendation, we find that his adoption of Principal Armstrong’s letter and his supplying this letter to the School Board constitutes substantial compliance. We note that the panel in Harris found substantial compliance with Step 5 of the West Carroll Parish School Board’s policy, which “step” is identical to the one in this case, where there was no evidence of any written recommendation from the superintendent at all and where no copy of any written recommendation was sent to Harris. Since there had been some “formal communication to the School Board relative to [the superintendent’s] proposed dismissal of Harris” such that it was placed on the school board’s agenda, this court held the omission of the written recommendation was not a fatal error.
Next, we find compliance with Step 6. The School Board was asked to consider the recommendation to terminate Ms. Scott and voted to adopt that recommendation.
Finally, we also find compliance with Step 7. The policy clearly states that Ms. Scott is not entitled to a hearing unless the majority of the School Board votes to afford one to her. Ms. Scott’s counsel was present at the meeting on 117September 12, 1995. On counsel’s request to address the School Board, a vote was taken and the School Board declined her counsel the opportunity to address it, thereby denying her the opportunity to a hearing. We find no violation of the policy in the School Board’s actions.

Admission of “new” evidence at trial

Ms. Scott also assigns as error the trial court’s admission of “new” evidence at trial, i.e., evidence that was not before the School Board when it voted to adopt Superintendent Johnson’s recommendation to terminate her employment. This “new” evidence, according to Ms. Scott, includes the testimony of witnesses (teachers and teachers’ aides) regarding specific occurrences of her unprofessional or inappropriate behavior. The essence of Ms. Scott’s argument is that, since such evidence was not available to the School *713 Board, it should not have been considered by the trial court in its determination of whether or not the School Board had “just cause” to terminate her. The flaw in this argument, however, is that all such evidence was available to, and relied upon by, the various persons who initially recommended Ms. Scott’s termination. Mr. Dawson related several concerns (including occurrences to which the various witnesses testified at trial) to Mr. Wallace, who, in turn, discussed the problems with Ms. Scott’s performance with Principal Armstrong. After investigation, which included a discussion with Ms. Scott, Principal Armstrong recommended her termination to Superintendent Johnson. We do not believe that the School Board must be privy to each specific instance of misconduct in order to justify adoption of the superintendent’s recommendation for termination. Once the matter has reached the School Board’s agenda, pursuant to the School Board’s policy, it has been thoroughly reviewed on several levels. The trial court’s admission of the evidence on which the various personnel relied in making the recommendation to terminate Ms. Scott’s l1semployment was entirely proper. Based on the evidence, the trial court found no deficiencies, procedural or substantive, in the School Board’s actions regarding Ms. Scott. We find no manifest error in the trial court’s conclusions.

Penalty Wages

As previously stated, the School Board has not appealed the award of unpaid wages through September 12, 1995, the date on which the School Board voted to terminate Ms. Scott, or its award of attorney fees in the amount of $1,500. Those issues, therefore, are not before us. Rather, the dispute over unpaid wages on appeal concerns the trial court’s denial of Ms. Scott’s request for penalty wages.
La. R.S. 23:631 provides that, upon the discharge of any employee, it shall be the employer’s duty to pay within three days the undisputed amount then due under the terms of employment. An employer who fails to comply with the above statute, shall be liable for 90 days penalty wages, at the employee’s daily rate of pay, and attorney fees. La. R.S. 23:632. In order for the employee to recover such penalty wages, the employer must be found to have acted in an arbitrary or unreasonable manner. Moore v. Fleming Subway Restaurants, 28,543 (La.App.2d Cir.8/21/96), 680 So.2d 78. It is well-settled that statutory provisions that are penal in nature are to be strictly construed. Further, equitable defenses are available, and penalty wages are not to be absolutely imposed irrespective of the circumstances. Henderson v. Kentwood Spring Water, Inc., 583 So.2d 1227 (La.App. 1st Cir.1991), citing Pace v. Parker Drilling Co. & Subsidiaries, 382 So.2d 988 (La.App. 1st Cir.1980), writ denied, 383 So.2d 1016 (La.1980). It is only a good-faith, non-arbitrary defense to penalty wage liability, however, which will permit the courts to excuse the employer from the imposition of penalties. Id., citing Carriere v. Pee Wee’s Equipment Co., 364 So.2d 555 (La.1978)19 and Soday v. Mall Snacks, Inc., 374 So.2d 138 (La.App. 1st Cir.1979). Whether there exists a valid equitable defense depends on the particular facts of each case. Id. Courts, however, have consistently held that equitable defenses are not available “when the failure to pay wages due according to the statute is attributable to neglect or improper pay procedure.” Henderson, supra, citing Duhon v. Prof Erny’s Music Company, Inc., 328 So.2d 788 (La.App. 3d Cir.1976); McCaskill v. Deviney Construction Company, 323 So.2d 178 (La.App. 3d Cir.1975), writ denied, 325 So.2d 615 (La.1976); Young v. White Stores, Inc., 269 So.2d 266 (La.App. 3d Cir.1972); Hendrix v. Delta Air Lines, Inc., 234 So.2d 93 (La.App. 4th Cir.1970), writ denied, 256 La. 364, 236 So.2d 498 (1970). Likewise, the supreme court has held that an employer’s reliance on an unlawful company policy does not constitute a good faith, non-arbitrary defense to liability for unpaid wages. Beard v. Summit Institute of *714 Pulmonary Medicine and Rehabilitation, Inc., 97-1784 (La.S/4/98), 707 So.2d 1233.
In the present case, Ms. Scott’s entitlement to the unpaid wages from August 18, 1995, to September 12, 1995, has not been appealed. With entitlement to wages established, we look only to whether penalties for the nonpayment of such wages is appropriate under the particular facts of this case. We believe that penalty wages are appropriate.
Only the School Board is vested with the authority to terminate employees. All parties agree that the actual termination date for Ms. Scott was September 12, 1995, the date on which the School Board approved her termination. The School Board argues, however, that Ms. Scott’s “effective date” of termination was August 18, 1995, as set forth in the School Board’s letter to Ms. Scott advising her of her termination. Superintendent Johnson testified that, while there is no actual “policy” defining when a terminated employee’s pay will be ceased, it is the | ¡^administrative practice of the School Board to cease payment of wages at some “effective date” prior to the School Board’s approval of the termination. That “effective date” is within Superintendent Johnson’s sole discretion. In fact, he testified that, in some cases, he has paid employees through the date on which the School Board approves termination, while, in other cases, he advises the personnel department to cease payment at an “effective date” of termination prior to the School Board’s approval of termination. The School Board asserts that this is a reasonable practice in light of the personnel demands on the School Board. While we agree that such “practice” is not an intentional effort on the part of the School Board to deny terminated employees wages to which they are entitled, such practice inevitably results in some terminated employees being paid through his/ her actual termination date, while others are paid through a randomly determined “effective date” prior to the actual termination date. We find this to be an improper pay procedure and, thus, not a justifiable basis for a defense to nonpayment of wages under La. R.S. 23:631. Wages should be paid through the actual date of termination. As such, pursuant to § 632, Ms. Scott is entitled to penalty wages for 90 working days at the pay rate of $45 per day, the amount to which the parties stipulated, for a total of $4,050.
Additionally, attorney fees are recoverable in a well-founded suit for unpaid wages. Beard, supra; Carriere, supra. In light of our conclusions that unpaid wages and penalty wages were due, we find that attorney fees were properly awarded.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is amended to award Lula Scott penalty wages in the amount of $4,050. In all other respects, the 12ijudgment of the trial court is affirmed. Costs are taxed to Plaintiff/Appellant, Lula Scott.
AMENDED AND, AS AMENDED, AFFIRMED.

. Mr. Dawson testified that Ms. Scott came to his home to request his signature on the statement and did not at any time inform him that she intended to use the statement to defend against her proposed termination.

. Specifically, Ms. Scott complains that she was not given sufficient notice of the initial conference with Superintendent Johnson; that she was not provided with the names of persons who had complained about her behavior or the dates of any alleged incidents; an d that she was not allowed to present witnesses on her behalf, nor was her attorney allowed to address either the group gathered in the initial conference or the School Board itself at the meeting during which the vote was made to terminate her employment.

. La. R.S. 17:82 reads as follows:
§ 82. Lunch departments, authority to operate
The parish school boards throughout the state may maintain and operate lunch departments on a non-profit basis to provide meals for school children attending the public schools within their respective jurisdictions.
The employees in these departments shall not be entitled to tenure rights under any of the tenure laws of the public school system.