35 So.3d 334 (2010)
Timothy J. BERARD
v.
L-3 COMMUNICATIONS VERTEX AEROSPACE, LLC.
No. 2009 CA 1202.
Court of Appeal of Louisiana, First Circuit.
February 12, 2010.
Rehearing Denied March 1, 2010.
*338 David M. Korn, MaryJo L. Roberts, New Orleans, Louisiana, for Defendant/Appellant, L-3 Communications Vertex Aerospace, LLC.
Marvin E. Owen, Baton Rouge, Louisiana, for Plaintiff/Appellee, Timothy J. Berard.
Before DOWNING, GAIDRY, and McCLENDON, JJ.
GAIDRY, J.
An employer appeals a summary judgment awarding a terminated employee unpaid wages, statutory penalty wages, and attorney fees. For the following reasons, we affirm the judgment.

FACTS AND PROCEDURAL HISTORY
The plaintiff, Timothy J. Berard, a helicopter mechanic, was a resident of Prairieville, Louisiana. After applying for employment and being interviewed by telephone at his home, he was hired to work outside the United States by the defendant, L-3 Communications Vertex Aerospace, LLC (L-3). L-3 was a military contractor authorized to do business in Louisiana. The "Overseas Employment Contract" between the parties was dated July 18, 2006, and was signed by Mr. Berard on July 20, 2006, in Prairieville. The term of the contract was one year, commencing on the date the employee left the United States, and the "place of employment [was] defined as being worksites outside the limits of the continental United States." Mr. Berard's employment under the contract commenced on August 9, 2006, presumably the day he left the United States.
Mr. Berard was initially assigned to work in Kuwait, but was later transferred to Kandahar Air Force Base in Afghanistan. On May 21, 2007, he was involved in a physical altercation with another L-3 employee, Lloyd Howden. On May 23, 2007, Mr. Berard was advised by Gregory Stokes, L-3's outgoing site supervisor at Kandahar, and by Gilbert Cherubini, the incoming site supervisor, that his employment would be terminated and that he was to leave that worksite for out-processing in Kuwait.
After arranging to mail his equipment back to the United States, Mr. Berard left Kandahar around May 30, 2007 on a military flight to Bagram Air Force Base. In June 2, 2007, he left on another military flight to Qatar Air Force Base, from where he flew to Kuwait, where he was out-processed from employment on June 3, 2007.
*339 On August 13, 2007, Mr. Berard sent a letter by certified mail to L-3, demanding payment of travel and per diem pay for May 25 through June 3, 2007. The letter was received by L-3 on August 15, 2007.
On October 17, 2007, Mr. Berard filed a petition naming L-3 as defendant and claiming unpaid wages from May 25 through June 3, 2007, as well as penalty wages and attorney fees pursuant to the Louisiana Wage Payment Act, La. R.S. 23:631, et seq.
L-3 initially responded to the petition with a peremptory exception of no cause of action, contending that the petition failed to assert a cause of action for overtime compensation as a matter of law, as federal law preempted application of the Louisiana Wage Payment Act to a claim for unpaid overtime compensation. Mr. Berard subsequently amended his petition to clarify that his overtime pay (in excess of 48 hours per week) was not based upon the provisions of federal law, but on the specific terms of the employment contract and L-3 policy. Following the amendment, L-3 withdrew its exception.
In its answer to the petition, L-3 admitted certain facts relating to Mr. Berard's employment, but denied liability for unpaid wages, penalty wages, and attorney fees. It also affirmatively pleaded defenses of equitable estoppel, failure to mitigate damages, and the plaintiffs lack of entitlement to the relief sought.
On June 30, 2008, Mr. Berard filed a motion for summary judgment, together with a supporting affidavit and attached exhibits, alleging that he was entitled to judgment in his favor as a matter of law.
On July 10, 2008, L-3 filed a cross-motion for summary judgment, contending that there was no genuine issue of material fact that Mr. Berard was not entitled to the benefit of the Louisiana Wage Payment Act as a matter of law.
Both motions were heard by the trial court on September 8, 2008, after which the trial court took the matter under advisement. On September 15, 2008, L-3 filed by facsimile telecopier an ex parte motion to supplement the record by authenticating its supporting evidence. This motion was granted by the trial court on September 19, 2008.
On January 7, 2009, the trial court rendered and signed its judgment on the cross-motions, denying L-3's motion and granting Mr. Berard's motion. The summary judgment in favor of Mr. Berard awarded him unpaid wages of $2,525.04, penalty wages of $35,175.60, attorney fees of $12,232.00, and all costs of court. L-3 now appeals.

ASSIGNMENTS OF ERROR
L-3 contends that the trial court committed error in the following respects:
1. The trial court erred in finding that [Mr.] Berard was entitled to summary judgment pursuant to the Louisiana Wage Payment Act because genuine issues of material fact remain.
2. The trial court erred in awarding penalty wages as [L-3] has a bona fide dispute regarding the wages claimed and at all times acted in good faith.
3. The trial court erred in awarding attorney's fees to [Mr.] Berard as he did not bring a well-founded suit for wages.
4. The trial court erred in finding that the Louisiana Wage Payment Act is applicable to this litigation as a matter of law.

DISCUSSION

Summary Judgment
Summary judgment is subject to de novo review on appeal, using the same *340 standards applicable to the trial court's determination of the issues. Peak Performance Physical Therapy & Fitness, LLC v. Hibernia Corp., 07-2206, p. 5 (La. App. 1st Cir.6/6/08), 992 So.2d 527, 530, writ denied, 08-1478 (La.10/3/08), 992 So.2d 1018. The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
The mover has the burden of proof that he is entitled to summary judgment. See La. C.C.P. art. 966(C)(2). If the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent's claim, action, or defense. La. C.C.P. art. 966(C)(2). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the nonmoving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La. C.C.P. art. 966(C)(2). If the mover has put forth supporting proof through affidavits or otherwise, the adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B).
In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Hines v. Garrett, 04-0806, p. 1 (La.6/25/04), 876 So.2d 764, 765. Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor. Willis v. Medders, 00-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050.

Conflict of Laws and Applicability of Louisiana Law
In its fourth assignment of error, L-3 has challenged the trial court's judgment on the grounds that the Louisiana Wage Payment Act cannot apply as a matter of law to Mr. Berard's cause of action. That assignment of error appears to address both the legal existence of Mr. Berard's right of action and the subject matter jurisdiction of the trial court and this court, and implicitly invokes a question of conflict or choice of laws.[1] We will address that assignment of error first, as the resolution of the legal issue presented therein will determine our consideration of the first three assignments of error.
*341 L-3 contends that the Louisiana Wage Payment Act is not applicable to Mr. Berard's claim and that he is not entitled to invoke the benefit of its provisions because the factual circumstances of his employment do not place him within the class of persons the Act was intended to protect. The employment contract at issue was indisputably executed within the United States, and the parties clearly intended for it to govern their relationship and to create enforceable legal obligations. The pertinent issue is the particular substantive law applicable to the claims asserted by Mr. Berard. L-3 contends that there is insufficient basis for application of Louisiana law to those claims.
The only authority cited by L-3 in support of that contention is the case of Shinew v. Luciano Refrigerated Transp., Inc., 96-2454 (La.App. 1st Cir.11/19/97), 706 So.2d 140. Relying upon certain language in that opinion, L-3 advances the argument that an employee's payment of Louisiana income taxes on his wages is a necessary predicate to assertion of a penalty wages claim under the Louisiana Wage Payment Act. We disagree.
The plaintiffs in Shinew were residents of Ohio employed by a Louisiana corporation. They claimed that they resigned their employment because of the employer's breach of their employment contract, and sought damages for breach of the contract, as well as penalty wages for unpaid wages pursuant to the Louisiana Wage Payment Act. The plaintiffs asserted their entitlement to assert the latter claim by reason of the facts that the employer was a Louisiana corporation, their employment was approved in Louisiana, and their checks were issued and mailed from Louisiana. The employer presented evidence that the plaintiffs were interviewed in Mississippi and Tennessee, worked out of its Tennessee terminal, lived in Ohio, and received their checks either in Ohio or at the Tennessee terminal. Additionally, only Ohio state income taxes were deducted from the plaintiffs' checks. Id., 96-2454 at p. 2, 706 So.2d at 140-41.
As pointed out by Mr. Berard, this court did not even reach the merits of the substantive applicability of the Louisiana Wage Payment Act in Shinew because we concluded that the trial court's judgment was not an appealable judgment and remanded the case. Id., 96-2454 at pp. 4-5, 706 So.2d at 141-42. Not only does the appellate opinion in the cited case fail to address the relevance of payment of Louisiana income taxes, but the trial court's decision does not support that conclusion. The payment of state income taxes was simply a factor considered by the trial court in weighing the respective relationships and relevant policies of the involved states having interests in applying their laws. There, the fact that Ohio state income taxes were deducted from the employees' paychecks (and Louisiana state income taxes were not) was only one of several relevant factors considered by the trial court, and not determinative of the issue. L-3 has made no showing here that another state's income taxes were payable by Mr. Berard, to the exclusion of Louisiana state income taxes. Mr. Berard, on the other hand, produced undisputed evidence of his domicile in Louisiana during the time period at issue, and his federal and Louisiana income tax returns for 2006 and 2007 likewise verify his Louisiana domicile and potential liability for Louisiana state income taxes.
Louisiana Civil Code article 3537 sets forth the general rule to resolve conflict of laws relating to contracts. It provides:
Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously *342 impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.
With respect to the foregoing, it has been observed that "[i]n an employment contract, the place where the services were to be rendered would usually be among the more important factual contacts, and the policy of `protecting one party from undue imposition by the other' would acquire particular significance." La. C.C. art. 3537, Revision Comments 1991, (g). (Emphasis added.) It is therefore particularly significant that the main purpose of La. R.S. 23:631 and 632 is to compel an employer to pay the earned wages of an employee promptly after his dismissal or resignation, and that these statutes were enacted to protect the public interest. See Becht v. Morgan Buildings & Spas, Inc., 01-1091, p. 3 (La.App. 1st Cir.6/21/02), 822 So.2d 56, 58, writ granted, 02-2047 (La.11/8/02), 828 So.2d 1117, aff'd, 02-2047 (La.4/23/03), 843 So.2d 1109, cert. denied, 540 U.S. 878, 124 S.Ct. 289, 157 L.Ed.2d 142 (2003). Additionally, another policy behind La. R.S. 23:632 is that of "encouraging workers to assert their rights to [unpaid] wages and motivating attorneys to prosecute those suits to insure that the working people of this state will not be deprived of their earnings[.]" Beard v. Summit Inst. for Pulmonary Med. & Rehab., Inc., 97-1784, p. 10 (La.3/4/98), 707 So.2d 1233, 1238.
In short, the obvious purpose of the statutes is the protection of discharged Louisiana employees from unfair and dilatory wage practices by employers. In that regard, Louisiana clearly has a more significant and compelling interest in protecting its own citizens than any other state. Additionally, since the employee's services at issue were to be rendered outside the United States, no other state can be said to have more interest than Louisiana as to that factual element.
Louisiana Civil Code article 3515 sets forth general principles of conflict of laws applicable in the event that a more specific article does not apply, but those general principles are at the same time the basic foundation of the specific principles of the other articles on conflict of laws. See La. C.C. art. 3515, Revision Comments1991, (a). It provides as follows:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences *343 that might follow from subjecting a party to the law of more than one state.
(Emphasis added.)
All other factors being equal, the parties should not be subjected to the law of a state that they had no reason to anticipate would be applied to their case. La. C.C. art. 3515, Revision Comments1991, (c). If the parties reasonably expected that the law of a certain state would govern some or all aspects of their contractual relationship, such expectation is clearly appropriate for consideration in determining whether that state's law should be applied to a dispute, even if the parties did not expressly state a choice of applicable law in their agreement.
We agree with Mr. Berard that jurisprudence relating to application of our workers' compensation statutes provides guidance in applying these principles. In determining whether a contract of hire should be regarded as a Louisiana contract or that of another state in a workers' compensation case, the parties' intent should be paramount. Lakvold v. Stevens Transp., 95-0866, p. 3 (La.App. 1st Cir.12/15/95), 665 So.2d 828, 829. Some of the relevant factors to determine such intent would include the parties' domiciles, the nature of the work, and the place where the employment was initiated. Id. See also Baldwin v. N. Am. Energy Services, 07-667, pp. 2-4 (La.App. 3rd Cir.10/31/07), 970 So.2d 101, 103, writ denied, 07-2310 (La.2/1/08), 976 So.2d 717. L-3 emphasizes that its interviewer was in Oklahoma during Mr. Berard's pre-employment telephone interview, and that the hiring decision was made in that state. Mr. Berard's affidavit sets forth the factual circumstances of his being interviewed by telephone while at his home in Louisiana, undergoing a physical examination in Baton Rouge at L-3's request, and L-3 providing him airfare from Louisiana to Texas for in-processing and orientation prior to leaving the United States. The latter circumstances support a determination that the employment contract was a Louisiana contract. See Baldwin, 07-667 at pp. 3-4, 970 So.2d at 103, and cases cited therein.
L-3's "Termination of Employment" form for Mr. Berard was prepared and dated June 3, 2007, and was signed by both L-3's site supervisor and Mr. Berard on that date. It lists the "reason for termination" as "misconduct," and states that his "last day worked" was May 23, 2007 and that his "date of termination" was June 3, 2007. Most significantly, under the caption, "State Requirement," the form lists two alternate "payout" options: "immediate payout" or "normal payout," followed by a blank line for the "Name of State." The form has the box for "normal payout" checked, with "LA" written for the "Name of State." The latter circumstance clearly confirms that the parties intended that Louisiana law would govern the required time frame for payment of the final wages due under the employment contract.[2] Any doubt that such is the proper result is removed by reference to Paragraph 5(a) of L-3's own Standard Operating Procedure A-17, "Disciplinary Actions," which unequivocally provides:

Because termination laws vary from state to state the Site Supervisor/Team Leader should verify the laws for his *344 particular site prior to any kind of involuntary termination of any employee to avoid costly litigation. He/she may do so via phone with the Human Resources Department personnel.
(Emphasis added.)
During the course of these proceedings, L-3 has failed to point to, or even to suggest, any specific jurisdiction whose laws might reasonably be entitled to more weight than those of Louisiana. In light of the foregoing, we need not indulge in a detailed interest analysis comparing the relevant policies of Louisiana with those of Oklahoma or any other state. We hold that the employment contract was a Louisiana contract, and that the payment of wages due upon its termination was subject to the Louisiana Wage Payment Act. This assignment of error has no merit.

Elements of Proof and Defenses Under the Louisiana Wage Payment Act
Louisiana Revised Statutes 23:631 provides, in pertinent part, as follows:
A.(1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.
...
(2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee's or laborer's current address as shown in the employer's records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official United States postmark or other official documentation from the United States Postal Service.
...
B. In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have the right to file an action to enforce such a wage claim and proceed pursuant to Code of Civil Procedure Article 2592.
Louisiana Revised Statutes 23:632 in turn provides:
Any employer who fails or refuses to comply with the provisions of [La.] R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
To recover penalties under La. R.S. 23:632, the employee must prove that (1) wages were due and owing; (2) demand for payment was made at the place where the employee was usually paid; and (3) the employer failed to pay upon demand. *345 Schuyten v. Superior Sys., Inc., 05-2358, pp. 3-4 (La.App. 1st Cir.12/28/06), 952 So.2d 98, 102. Because La. R.S. 23:632 is penal in nature, it must be strictly construed. Id., 05-2358 at p. 4, 952 So.2d at 102.
Equitable defenses are available, and penalty wages are not to be absolutely imposed. Becht, 01-1091 at p. 2, 822 So.2d at 58. However, when the employer is arbitrary, sets out procedural pitfalls for the employee, or is merely negligent in failing to pay past due wages, penalty wages will be assessed. Id., 01-1091 at p. 3, 822 So.2d at 58. Whether there exists a valid equitable defense to a claim of penalty wages depends on the particular facts of each case. Henderson v. Kentwood Spring Water, Inc., 583 So.2d 1227, 1232 (La.App. 1st Cir.1991); Robinson v. Apria Healthcare, Inc., 38,438, p. 15 (La.App. 2nd Cir.5/27/04), 874 So.2d 418, 427. For example, reliance on an unlawful company policy does not constitute a good faith, non-arbitrary defense to liability for unpaid wages. Beard, 97-1784 at p. 9, 707 So.2d at 1237. Even good faith reliance on an attorney's advice may not amount to an equitable defense. See Magee v. Engineered Mech. Services, Inc., 415 So.2d 277, 280 (La.App. 1st Cir.), writ denied, 420 So.2d 455 (La.1982).
Unlike the award of penalty wages, the award of reasonable attorney fees under La. R.S. 23:632 is mandatory when an employee brings a "well-founded" suit for unpaid wages, irrespective of any equitable defenses that may have been raised. Suits in which the recovery of unpaid wages is granted are considered "well-founded." Cleary v. LEC Unwired, L.L.C., 00-2532, pp. 9-10 (La.App. 1st Cir.12/28/01), 804 So.2d 916, 923.

Wages Due Under the Employment Contract
It is undisputed that at the time he was terminated, Mr. Berard's hourly wage rate was $27.57, and his normal work day consisted of twelve hours. He worked seven days a week. Overtime pay at 1.5 times the normal rate was paid for all hours worked in excess of 48 hours per week. His regular daily rate of pay (including per diem compensation of $60.00) was $390.84.
The employment contract also contained the following pertinent provisions:
2. Salary Administration: WAGES:... WORK WEEK: Company agrees that a minimum of 40 hours work will be made available to the Employee. Employees who work less than this 40 hours per week, due to personal or other non-employer controlled reason, will only be paid for the actual hours worked. The work week will be established by the Company in accordance with Company Policy, Federal Labor Laws, Local Labor Laws, terms of the contract and/or the request of the customer, as the applicable circumstances warrant. With the exception of employment in areas under the jurisdiction of the Federal Labor Laws, a standard 48 hour work week can be established without payment of overtime wages. Under these circumstances, time and one-half the hourly rate will be paid for hours worked in excess of 48 hours within the established work week.
3. Transportation: ...
a. On completion of Employee's full term of service thereunder as defined in paragraph one, or on prior determination [sic] thereof by Company for any reason other than cause, Company shall pay expenses of Employee's passage to his home of record, in accordance with established policy...

*346 b. In the event Employee's term of service thereunder shall be terminated by the Company for cause during Employee's full term of service thereunder, as set out in paragraph six, ... Company shall be under no obligation to pay, or to contribute in any manner to the expenses of the Employee's passage to his home nor to pay Employee any salary for the time consumed in returning thereto or for any other period beyond the date of such termination. ...
4. Conduct of Employee: Employee hereby undertakes and agrees to comply with and abide by all general regulations and instructions from time to time issued by Company, including those governing hours and conditions of work, and to obey all lawful orders given by the Company, its managers, or other duly authorized person or persons....
...
6. Termination by Company for Cause: Company may summarily terminate Employee's service thereunder at any time for cause, such as insubordination,... non-compliance with Company regulations or instructions, ... misconduct,... or if Company is requested to remove the Employee by any Government official.
7. Employee's Departure: On completion or in the event of termination of Employee's service thereunder, it is understood the Employee must depart from the zone of operations on the date specified by the Company.

(Emphasis added.)
L-3's Local Operating Instruction SWA A-07, addressing the subject of "Theater Movement Requirements," provided that in cases of employee termination or contract completion, "[personnel transferring to Kuwait for contract completion will be submitted for up to 8 hours per day starting on the day they start traveling to Kuwait[,]" and that "[t]his [time and attendance] will be completed in Kuwait upon arrival." Thus, while in travel status, Mr. Berard would be entitled to $280.56 (including per diem) per day.[3]

Suspension Without Pay
L-3 contends that Mr. Berard was suspended without pay following the altercation and pending the completion of an investigation that ultimately resulted in his termination, and that the trial court erred in granting summary judgment because of a genuine issue as to that material fact. Mr. Berard disputes that contention, emphasizing that he was never told that he was suspended without pay prior to the effective date of termination, and that L-3's employment records contain no mention of any such suspension without pay.
In support of its defense that Mr. Berard was suspended without pay pending his terminations, L-3 presented an amended response to a request for admission, describing a telephone conversation with Mr. Berard's original attorney, who was purportedly told at that time that Mr. Berard had been suspended without pay prior to termination. L-3 also filed a copy of an e-mail of September 18, 2007 from Hayley Frazier, a human resources manager, to Linda Mandel, its human resources director, verifying that Ms. Frazier had spoken with Mr. Berard's attorney and "explained that the Company's position is that he was suspended without pay pending the outcome of the investigation," and that "[h]e was not on [sic] working, *347 thus was not due payment." Nothing in the e-mail itself or in Ms. Frazier's later affidavit authenticating various L-3 business records shows that Ms. Frazier had personal knowledge relating to the circumstances of the purported suspension in Afghanistan. The foregoing evidence plainly does not constitute direct, competent proof of Mr. Berard's actual suspension without pay while overseas; at best, it is only proof that L-3 took the position, following its initial receipt of Mr. Berard's claim, that he was suspended without pay.
L-3 also filed excerpts from Mr. Berard's deposition of April 3, 2008 to support its position that he was suspended without pay. L-3 posits that in his testimony, Mr. Berard supposedly recognized that he might have been suspended. The crucial testimony upon which L-3 relies, however, is fragmentary, and its context is uncertain and ambiguous:
... understand how they're now saying I was suspended. I must have got suspended when I left the base. That's what happened. When I left Kandahar, they suspended me.
The first sentence is incomplete, and the question to which Mr. Berard's answer was made is unknown. The uncertain phraseology, "must have got [sic] suspended," seen in light of the supposed time of the event ("when I left the base"), is only speculation on Mr. Berard's part regarding a possible suspension rather than personal knowledge of an actual event he witnessed or experienced. And the fragmentary excerpt does not relate the suspension to pay or wages; it could just as easily be interpreted as referring to a suspension from duty. The limited testimony is therefore not competent to create a genuine issue of material fact on the issue.
L-3 also filed into the record a properly-authenticated copy of its Standard Operating Procedure A-17, "Disciplinary Actions," together with a designated eight-page "Attachment" entitled "Rules of Conduct." L-3 also filed an authenticated copy of Mr. Berard's signed acknowledgment that he received and reviewed both of those documents. Our review of the content of L-3's procedures and Mr. Berard's signed acknowledgment relating to them convinces us that the parties intended to be bound by their provisions, and that Mr. Berard therefore had the right to rely upon L-3's representations therein.
Included within the "Employee Rules of Conduct" is a section entitled "Documentation Procedure," which significantly provides the following:
A. After complying with the documentation procedure by thorough completion of a Disciplinary Action Form, management shall transmit copies of warnings, suspensions without pay, and/or termination to the employee involved, to the employee's immediate supervisor, and to the employee's personnel file.

B. It is management's responsibility to ensure that the Disciplinary Action Form remains within the employee's personnel file, and should be retained regardless of transfer....
(Emphasis added.)
L-3's "Employee Rules of Conduct" sets forth a four-step disciplinary process, with each successive step or level of discipline increasing in severity according to the corresponding severity of the offense. Step 1, "Verbal Counseling" and Step 2, "Written Warning" apply to minor infractions. Step 3, "Suspension Without Pay" may be given for a subsequent minor infraction after issuance of a prior written warning under Step 2, or for a major infraction. Step 4, "Termination" may be given for a subsequent minor infraction after issuance of a *348 prior suspension without pay under Step 3, or for a major infraction.
The "Employee Rules of Conduct" lists sixteen defined (although non-exclusive) "minor infractions" or "conduct violations," with corresponding "possible consequences" for all ranging from verbal counseling through termination (all four steps). There are 24 "major infractions" listed, but the "possible consequences" vary from "suspension without pay or termination" to simply "termination." Mr. Berard was guilty of violation of Conduct Violation J-18, the major infraction of "[p]hysical violence or fighting on Company controlled property." The only "possible consequence" listed for that major infraction is termination.
Step 3, "Suspension Without Pay" expressly requires that after management identifies the issue warranting the suspension to the employee, with a witness present, the employee is to be asked to sign the "Disciplinary Action Form." The form is then placed in the employee's personnel file and "will remain in the employee's personnel file indefinitely[.]" No such documentation of Mr. Berard's alleged suspension without pay was ever produced by L-3. This glaring omission serves to effectively negate any purported factual issue raised by L-3's after-the-fact evidence. L-3 cannot bootstrap a genuine issue of material fact as to an actual suspension without pay by mere proof that it may have subjectively considered Mr. Berard to have been suspended after he broached the issue of unpaid wages.
The undisputed fact that Mr. Berard was in fact paid by L-3 for May 24 and 25, 2007 further refutes L-3's argument that he was immediately suspended without pay as of May 23, 2007. Neither the affidavit of Mr. Cherubini, his two unsworn statements incorporated by reference therein, nor the affidavit of Ms. Frazier provide any factual support to its claim that Mr. Berard was suspended without pay, or that he was informed of such suspension prior to the effective date of his termination.
Although Mr. Berard was ultimately terminated, he was not suspended without pay. Under L-3's own written employment policies, supported by Mr. Berard's affidavits, L-3's admissions, and other competent evidence, he was entitled to up to eight hours per day travel time and per diem allowances after closing his timesheet in Kandahar through the effective date of his termination and departure from the out-processing site in Kuwait. See Scott v. Ouachita Parish Sch. Bd., 33,964, pp. 19-20 (La.App. 2nd Cir.9/27/00), 768 So.2d 702, 714.
Our de novo review of the evidence compels the conclusion that there is no genuine issue of material fact regarding the purported suspension without pay, and that L-3's reliance on that factual defense must therefore fail. Given the evidence in the record, L-3 must be charged with knowledge of its own internal procedures and rules that Mr. Berard was required to review and obey. Accordingly, it has no valid excuse for its failure to comply with its own procedures and no good faith defense for its failure to pay Mr. Berard any wages due him from May 25 through June 3, 2007. See Wyatt v. Avoyelles Parish Sch. Bd., 01-3180, 02-0131, 02-0259, p. 15 (La.12/4/02), 831 So.2d 906, 917.

Intentional Delay of Departure and Travel Time
L-3 further asserts that Mr. Berard intentionally delayed his departure from Afghanistan in order to inflate his "travel time" and to thereby extend his time overseas for his advantage in claiming a federal income tax exemption on wages earned outside the United States. Thus, it asserts, even if Mr. Berard was not suspended without pay, it has a valid equitable *349 defense by reason of Mr. Berard's intentional delay in departure, in disobedience to its supervisor's directive that he leave immediately and its policy or rule that limited "travel time" to Kuwait to a maximum of three days.
Louisiana Code of Civil Procedure article 966(B) provides that summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." (Emphasis supplied.) The described documents are the only evidence that a court may properly consider in determining a motion for summary judgment.
Louisiana Code of Civil Procedure article 967(A) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (Emphasis supplied.) The article further expressly requires that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." (Emphasis supplied.)
Even if a hearsay exception, such as the "business records" exception of La. C.E. art. 803(6), might allow for the admission of records into evidence at trial, that does not necessarily mean that such records necessarily meet the standards for summary judgment. See Tritt v. Gares, 98-0704, p. 6 (La.App. 4th Cir. 12/23/98), 735 So.2d 659, 663. The fact that evidence may be admissible is not the same as saying that it is made based on personal knowledge, and is not sufficient in itself to satisfy the "personal knowledge" requirement of article 967. Id., 98-0704 at pp. 6-7, 735 So.2d at 663. Personal knowledge encompasses only those facts that the affiant saw, heard, or perceived with his own senses. Id., 98-0704 at p. 7, 735 So.2d at 663.
There are admittedly some cases that have permitted consideration of witness affidavits referring to or incorporating business records prepared by persons other than the sworn witnesses for summary judgment purposes. However, our review of that jurisprudence reveals that such business records, authenticated and incorporated by reference in affidavits, are generally limited to routine, contemporaneous records of events or circumstances "made and kept in the course of a regularly conducted business activity," as part of "the regular practice of that business activity to make and to keep" such records, such as accounting entries. See La. C.E. art. 803(6) and Brown v. Adolph, 96-1257, p. 7 (La.App. 1st Cir.3/27/97), 691 So.2d 1321, 1326.[4] All but one of the unsworn statements *350 are dated December 7, 2007, long after the events described occurred and over six weeks after suit was filed, and the lone exception is undated. Further, the affidavits of Mr. Cherubini and Ms. Frazier do not verify that the employees providing the unsworn statements were "routinely acting for the business in reporting the information" contained in those statements.[5] As such, the unsworn statements would probably not meet the evidentiary standards for admission as "business records" at trial on the merits, let alone the stricter criteria for consideration for summary judgment.
While the unsworn employee statements may have been properly certified by their custodian as L-3 business records under La. C.E. art. 803(6), such certification at best would only serve to relax the general evidentiary rule against hearsay; the certification did not obviate sworn affidavits from the witnesses, "made on personal knowledge" and "show[ing] affirmatively that the affiant[s] [were] competent to testify to the matters stated therein" for purposes of summary judgment. See La. C.C.P. art. 967(A).[6] A sworn certificate of a business records custodian simply does not function as the legal equivalent of the required personal knowledge for purposes of summary judgment. In summary, we conclude that the unsworn employee statements are not competent evidence for purposes of summary judgment under the circumstances.
The only competent evidence submitted by L-3 for the purpose of establishing its claimed defense of intentional and inordinate delay by Mr. Berard is limited to the affidavit of Mr. Cherubini and his appended statements and L-3's properly-authenticated employee procedures and rules. Mr. Cherubini's affidavit and statements contain only his personal knowledge that "[d]espite being asked to leave, Mr. Berard remained in Kandahar," that the other employee involved in the altercation left the next day, information relating to the general availability of vehicles to transport Mr. Berard's belongings to the post office, and that Mr. Berard eventually left five days after the initial request to him was made. In another statement attached to his affidavit and verified therein, Mr. Cherubini observed that he found it "strange" that Mr. Berard did not leave on the same flight as the other employee, and that he personally had never taken more than three days to leave Kandahar. Mr. Cherubini's statements to the foregoing effect are insufficient to establish any genuine issue of fact as to the circumstances and reasons relating to the timing of Mr. Berard's departure.
Mr. Berard's affidavit, by contrast, sets out detailed factual circumstances and explanations for the timing of *351 his departure from Kandahar and eventual arrival in Kuwait. Mr. Berard's statements in that regard are not actually contradicted by L-3's evidence that may properly be considered for purposes of summary judgment.[7] And, as shown by the following discussion, any dispute as to the purported issue of Mr. Berard's delayed departure from Kandahar is ultimately irrelevant for purposes of summary judgment.
Significantly, we conclude, as the trial court implicitly did, that L-3 failed to meet its burden of proof as to the supposed maximum of three days allowed for travel time. L-3's own Local Operating Instruction SWA A-07, authenticated by Ms. Frazier and cited in support of its position, in fact contradicts it. The stated purpose of that employer policy is "[t]o define employee responsibilities and site reporting requirements for personnel entering and exiting" L-3's Southwest Asia Theater of operations. The policy requires that L-3's site supervisor report employee departures and arrivals, and includes a non-exclusive list of "reportable reasons" for employees leaving the worksite, including such reasons as "LOA [leave of absence]," "[t]ransfer," "[t]ermination," "[m]edical [e]vacuation," and "[abandonment."
Paragraph 4, "Leave of Absence" sets out detailed instructions for the departing employees, duty drivers, site supervisors, and finance and human resources officers. For worksites without direct flights into Kuwait (such as Kandahar), the "timeline" for departure for leave of absence state that "[e]mployees may leave 3 days prior to the approved leave start date." Paragraph 5, "Termination/Transfer to CRC [Kuwait]" provides that "[e]mployees who are departing [the Southwest Asia Theater] due to contract completion" from worksites without direct flights into Kuwait "may leave 3 days prior to the coordinated [Southwest Asia Theater] departure date." The foregoing language does not purport to set a maximum limit of days for departure from the worksite, but rather defines how early an employee may leave the worksite in relation to his final departure *352 date from Kuwait. Finally, Paragraph 6 provides that "[terminating employees will close their timesheets at their site prior to departing en route to Kuwait" and that "[a]ll additional hours (effective the date of transfer) will be carried by the out-processing site in Kuwait and will not exceed eight hours per day." Thus, Local Operating Instruction SWA A-07 makes a clear distinction between those employees departing the worksite for leave of absence and those departing for Kuwait due to contract completion or termination.
There is no competent evidence in the record verifying that a "coordinated [Southwest Asia Theater] departure date" for Mr. Berard was established, nor that Mr. Berard missed any such date due to intentional delay. Thus, L-3's primary equitable defenses to the awards of unpaid wages and penalty wages are factually unsupported by competent contemporaneous evidence. The issues of fact that L-3 claims to exist are therefore not genuine, but rather seem to have been contrived or rationalized after Mr. Berard was terminated and after he initially presented his claim for unpaid wages. The evidence in the record supports the conclusion that L-3's defenses were unreasonable under the circumstances, and thus arbitrary and not in good faith as a matter of law, warranting the award of penalty wages.
Mr. Berard established a prima facie case for recovery under the Louisiana Wage Payment Act, and L-3 failed to meet its burden of establishing a genuine issue of material fact sufficient to defeat summary judgment on Mr. Berard's claims. The trial court's judgment was correct.

DECREE
The summary judgment of the trial court in favor of the plaintiff-appellee, Timothy J. Berard, and against the defendant-appellant, L-3 Communications Vertex Aerospace, LLC, is affirmed. All costs of this appeal are assessed to the defendant-appellant.
AFFIRMED.
McCLENDON, J. agrees in part and dissents in part and assigns reasons.
McCLENDON, J., concurring in part and dissenting in part.
I respectfully agree with the majority in all respects except to the extent that I find that genuine issues of material fact remain with regard to the reasons for Mr. Berard's delay of departure from Afghanistan and his travel time to Kuwait.
NOTES
[1] L-3 has not filed a peremptory exception raising those objections, either in the trial court or this court. But we choose not to indulge in a lengthy analysis of the proper procedural context or vehicle by which to raise the issue at hand. Rather, we will circumnavigate that procedural quagmire by concluding that the issue is properly before us by virtue of the threshold inquiry that summary judgment be appropriate "as a matter of law." See La. C.C.P. art. 966(B). A judgment granting or denying summary judgment is necessarily based upon the initial determination of the substantive law applicable to the issues, as it is only in the context of that applicable substantive law that any issues of material fact can be ascertained. See Talamo v. Johnston, 554 So.2d 800, 802 (La.App. 5th Cir. 1989).
[2] Louisiana Revised Statutes 23:631(A)(1)(a) requires the employer of a resigning or terminated employee "to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first." (Emphasis added.) Thus, L-3's designation of a "normal payout" in conjunction with its reference to Louisiana can only be interpreted as a reference to the quoted statutory requirement.
[3] The trial court's award of unpaid wages was $2,525.56, based upon nine days at $280.56 per day. Its award of penalty wages was $35,175.60, based upon 90 days at the regular daily rate of $390.84.
[4] Louisiana Code of Evidence article 803(6) provides, in pertinent part:

Records of regularly conducted business activity. A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule.
(Emphasis added.)
[5] None of the statements verify the routine character of the information recorded by the witnesses, or the routine nature of any duty on their parts to record that information. The date and limited content of the unsworn statements strongly suggest that they were prepared solely for the purpose of the defense of the civil action instituted by Mr. Berard, rather than for routine business purposes.
[6] The court in the Tritt case aptly observed:

Had it been the intention of the legislature to allow all admissible exceptions to the hearsay prohibitions, the first sentence of [La. C.C.P.] art. 967 would have made no reference to personal knowledge....
Were we to dilute the requirement that affidavits be based on personal knowledge, it should be all to [sic] easy to come up with hearsay affidavits effectively undermining the entire summary judgment process.
Tritt, 98-0704 at pp. 7-8, 735 So.2d at 663.
[7] Mr. Berard's affidavit included the following factual information and explanatory comments:

8. At the time that I was told that I would be terminated on May 23, 2007, I was also told that I needed to pack my bags and travel to the L-3 office at Kuwait City to be processed out of employment.
...
16. I was initially denied access to the company pickup truck that would have been available to move my gear to the flight line because another employee was using it to move his gear.
17. Mr. Howden used the pickup truck for a day or so after which I was able to have access to the pickup truck and took my gear to the Army Postal Service on May 24, 25 and 26 where I shipped it to the U.S. as per copies of the mailing receipts
...
18. The only transportation for L-3 employees in Afghanistan is by military transport and then only on a space available basis after the military needs have been met....
19. After packing and shipping my gear out, I was not able to get on a military transport to Kuwait City due to Block Leave that was underway by the U.S. Army.... [T]he Army Block leaves took precedence over [my] transportation.
20. On at least 3 days after shipping my gear, I was told to report to the flight line [so] that I could be on a direct flight that would take me to Kuwait City but on each occasion, the military needs resulted in my being bumped from the flight. There was only one such flight per week.
21. At the end of May, 2007, I was able to catch a military flight from Kandahar to Bagram Air Force Base.
22. After staying a couple of days at Bagram waiting for a flight, on June 2, 2007 I was able to get on a flight to Qatar Air Force Base where I caught another flight on to Ali Al Sadeen Air Force Base at Kuwait City.