874 So.2d 418 (2004)
Robert H. ROBINSON, Plaintiff-Appellee
v.
APRIA HEALTHCARE, INC., Defendant-Appellant.
No. 38,438-CA.
Court of Appeal of Louisiana, Second Circuit.
May 27, 2004.
*420 Chopin, Wagar, Cole, Richard, Reboul & Kutcher, L.L.P., by Elizabeth Smyth Sirgo, Anne Nyanda, Mayer, Smith & Roberts, by Caldwell Roberts, Metairie, for Appellant.
Lance P. Havener, Shreveport, for Appellee.
Before GASKINS, CARAWAY and MOORE, JJ.
GASKINS, J.
The defendant, Apria Healthcare, Inc. (Apria), appeals from a trial court judgment awarding the plaintiff, Robert H. Robinson, wages, statutory penalties, and attorney fees. For the following reasons, we reverse in part, amend in part, and affirm in part the trial court judgment.

FACTS
The plaintiff began working as a medical technician for a predecessor of Apria in 1986. The local branch of the company furnishes in-home medical equipment and respiratory therapy services to patients in the northern half of Louisiana. Apria acquired the company in the mid-1990s.
Due to the nature of the business, employees were frequently required to be "on call" to furnish and repair equipment or to render respiratory therapy. After hours, a patient service technician (PST) and a respiratory therapist (RT) were always "on call." Apria had an answering service take calls from patients which were then relayed to the appropriate party. If the PST or RT did not respond to the call within 15 minutes, a supervisor would be called. PSTs and RTs were hourly employees who were compensated for being "on call" after hours.
In 1997, the plaintiff was promoted to a management position, first as a distribution supervisor and later as a logistics supervisor. These jobs were supervisory, salaried positions, generally not eligible for "on call" compensation. In February 1999, Karen Daniel was named the branch manager. After numerous disputes with Ms. Daniel during the next three years, the plaintiff eventually resigned. The date of his resignation was July 23, 2002.
Several months after he left the company, someone anonymously sent the plaintiff information regarding an employee "on *421 call" memo sent out to its branches by Apria on February 9, 1999. According to the plaintiff, the memo provided that, even though he was a salaried supervisor, he was entitled to compensation for being the primary "on call" employee or the back-up "on call" employee. The plaintiff contended that he was never informed of the policy and was never paid for being "on call," even though he claimed that, in his supervisory position, he was the primary "on call" person or the back-up "on call" person for approximately four years.
On May 13, 2003, the plaintiff filed suit against Apria, arguing that the company refused his amicable demand for payment of the "on call" pay. He sought to recover unpaid wages as well as penalties and attorney fees pursuant to La. R.S. 23:631 and La. R.S. 23:632.
A hearing on this matter was held on July 9, 2003. On July 18, 2003, the trial court filed its findings of fact and conclusions of law. The court stated that the issue was whether the plaintiff was "on call" on a regular basis under Apria's policy and the terms of the plaintiff's employment. The court found that Apria's "on call" policy included payment for logistics supervisors such as the plaintiff. According to the court, the plaintiff was entitled to "on call" pay for the time he was expected to respond to his pager/cell phone/home phone to cover the demands of Apria.
The court found that since the effective date of the memo revising Apria's policy for "on call" payment, the plaintiff had been the back-up "on call" employee for 196 weeks and the primary "on call" employee for 16 weeks. He was awarded $18,130 for back-up "on call" pay and $2,960 for primary "on call" pay. The court noted that proper demand was made upon Apria which refused to pay the amounts due. Therefore, the court awarded 90 days of penalty wages and attorney fees of $10,000. A judgment to this effect was signed by the trial court on August 7, 2003. Apria appealed suspensively.

BURDEN OF PROOF
According to Apria, under the Fair Labor Standards Act, employees are divided into nonexempt hourly employees and exempt salaried employees such as the plaintiff. Under Apria's policy, only certain exempt employees are entitled to lump sum payments for "on call" services. Apria urges that the plaintiff failed to show that he met the requirements for receiving "on call" pay.
The plaintiff sought to recover past due pay from Apria under La. R.S. 23:631, which provides in pertinent part:
A. (1)(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.
(2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee's or laborer's current address as shown in the employer's records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official United States postmark or other official *422 documentation from the United States Postal Service.
B. In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have the right to file an action to enforce such a wage claim and proceed pursuant to Code of Civil Procedure Article 2592.
The plaintiff's entitlement to "on call" pay depends upon the terms and conditions of Apria's policy as applied to the evidence presented at trial. When the plaintiff received various policies and procedures manuals from Apria, he signed statements acknowledging that he was an "at will" employee.[1] The plaintiff was promoted to his position as a logistics supervisor in 1997. At that point, he was no longer paid an hourly rate, but was given an annual salary. Therefore, he was an exempt employee. Under the company policy in place at that point, the only time exempt employees would be paid for "on call" services was when they took clinical calls.
On February 9, 1999, Frank Bianchi, the Senior Vice President for Human Resources at Apria's corporate office in California, sent out a memo to all Apria branches. The memo outlined changes to the "on call" policy effective March 8, 1999. The purpose of the change in policy was to establish a uniform compensation plan for any employee who is "on call." Highlights of the policy included the specification that most exempt positions were not eligible for "on call" pay. Only those exempt positions that are "on call" on a regular basis were eligible for "on call" pay. Those positions were listed on a chart attached to the memo. The chart specifies that a logistics supervisor, such as the plaintiff, is eligible for lump sum "on call" pay or back-up "on call" pay for relief purposes only.
This memo was followed by a revised Human Resources Policies and Procedures Manual with a date of August 1, 2002.[2] The new manual incorporated many of the provisions of the 1999 memo. It also specified that "back-up" shall mean subject to secondary, not primary call. Employees entitled to compensation for back-up "on call" duty were to be paid 50 percent of their daily rate of pay.[3]
Based upon Apria's policy, even though the plaintiff was a salaried supervisor, he would be entitled to "on call" or back-up "on call" pay under certain circumstances. The plaintiff introduced into evidence the instructions given to Apria's answering service specifying that if a PST failed to *423 respond to a page within 15 minutes, the service was to page supervisors. The plaintiff was first in the call order, followed by Ms. Daniel and several other supervisors.
Cathy Klein, the director of employee relations and risk management at Apria's corporate headquarters in California, acknowledged that company policy allowed "on call" pay for exempt supervisors under specific circumstances. Logistics supervisors such as the plaintiff are entitled to "on call" pay for relief purposes only where there is a sporadic shortage of help. Ms. Klein testified that a supervisor would only be entitled to "on call" pay if no one else was available to respond to an emergency and the supervisor went out on the call. In such a situation, he would only be entitled to lump sum "on call" pay and not hourly "call back" pay. She testified that normally the back-up "on call" person would not be a supervisor. Ms. Klein contended that receiving calls at home after hours was part of the job covered by the salary paid to supervisory personnel.
In support of his claim for unpaid wages, the plaintiff testified on his own behalf. The plaintiff stated that he first became aware of the "on call" policy to pay supervisors in an anonymous fax that arrived in January or February 2003, several months after he left employment with Apria. According to the plaintiff, he was the back-up "on call" person for 196 weeks and the primary "on call" person for 17 weeks. He stated that if the primary "on call" person could not be reached, the answering service was instructed to call him. The service would call his house and then would page him if it got no answer. The plaintiff said that he went on numerous calls after he became a supervisor. The plaintiff testified that sometimes on weekends, there were too many calls for the PSTs and RTs to handle. Therefore, he was required to help. He claimed that Ms. Daniel made it clear that no calls were to get around him. He stated that on only one occasion, another supervisory employee, Tina Gamble, had to handle a call after hours and that she was paid for it.
On several occasions, he asked Ms. Daniel about receiving pay for being "on call" and was told that he did not qualify because he was a supervisor. He claimed that he inquired about filling out route sheets but was told that, as a supervisor, he was not entitled to be paid for his work after hours. He then requested that Tina Gamble might also serve as back-up "on call" on occasion. He was told that this was not part of Ms. Gamble's job.
In support of his claims, the plaintiff also offered the testimony of several coworkers. Adrian D. Fletcher was a nonexempt employee that worked as a PST for Apria for about seven years and was supervised by the plaintiff. He asserted that Ms. Daniel called a meeting of all PSTs who take calls. She said that if they failed to respond to a call within 15 minutes, the answering service would page the plaintiff. Ms. Daniel instructed the group that the plaintiff was to be the back-up "on call" person. Mr. Fletcher testified that when he could not answer a call timely, the plaintiff answered the call. On only one occasion did someone else answer a call when Mr. Fletcher could not respond.
Salvator Patricola worked as a PST for Apria and was supervised by the plaintiff. He testified that the plaintiff was the primary back-up "on call" person. Although he did not recall any instances in which the plaintiff actually made a delivery for him, he stated that he frequently called the plaintiff after hours with work-related questions.
Melissa White testified that she was employed as a RT with Apria until January 2003. Ms. White said that Ms. Daniel *424 referred to the plaintiff as the primary back-up "on call" person. Ms. White was instructed to contact the plaintiff if she was called out after hours and needed help. She said that she frequently called the plaintiff. She stated that the plaintiff carried a beeper and a cell phone.[4]
Gary Gamble worked at Apria and was supervised by the plaintiff. He stated that Tina Gamble was married to his cousin. Mr. Gamble was instructed that the plaintiff was the back up "on call" person. He was not aware of any situation where the plaintiff was the primary "on call" person.
Dorothea Lee Peterson testified that she worked at Apria. Tina Gamble was her immediate supervisor. Ms. Peterson stated that she was told by Ms. Gamble and Ms. Daniel that the plaintiff was the primary back-up "on call" person. According to Ms. Peterson, when the answering service took over after hours, it was instructed to refer all problems to the plaintiff. Ms. Peterson stated that Ms. Daniel and Ms. Gamble were not "on call."
Karen Daniel testified that she was the branch manager of Apria for Shreveport, Monroe, and Alexandria. The plaintiff, a logistics supervisor, was in charge of the PSTs. She denied the plaintiff's contention that he was the only supervisor contacted if a PST or a RT could not be reached. She stated that she usually got one or two calls per month. Ms. Daniel recalled one occasion in which Ms. Gamble took an after-hours phone call that was very lengthy. She was paid for that call because the occurrence was out of the ordinary. Ms. Daniel denied telling other Apria employees that the plaintiff was the primary back-up "on call" person.
According to Ms. Daniel, the plaintiff never requested payment for handling calls after-hours. She stated that the company only had primary "on call" employees and that there was no such thing as a back-up "on call" person. She stated that supervisors were listed on the call list with the answering service because in some rural areas the PST or RT cannot receive a page or cell phone call.
It is well settled that the trial court's finding of fact may not be set aside on appeal in the absence of manifest error or unless it is clearly wrong. Stobart v. State through Department of Transportation and Development, 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the fact-finder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). An appellate court should not substitute its opinion for the conclusions made by the district court, which is in a unique position to see and hear the witnesses as they testify. In re A.J.F., XXXX-XXXX (La.6/30/00), 764 So.2d 47.
Under Apria's employment guidelines, both theories presented by the parties regarding wages were possible. The defendant's view was that supervisors, like the plaintiff, are to be available for off-hours calls as a part of their duties as supervisors. Their salary provides compensation for this duty. The plaintiff contends that he was placed on "on call" duty which is additionally compensated by the memo of February 9, 1999. It was up to the trial judge to make the factual determination as *425 to whether the plaintiff was fulfilling his supervisory duties or was specifically charged with "on call" duty. The trial judge found the plaintiff to have been placed "on call" or back-up "on call."
Plaintiff did not carry his burden of proof that he was the primary "on call" employee for 16-17 weeks. Therefore, that portion of the judgment awarding pay for primary "on call" duty is reversed and vacated. The evidence did support that the plaintiff is entitled to pay for back-up "on call" duty. However, as set forth below, we amend the judgment in this regard, based on an incorrect calculation of the amount of time the plaintiff worked in the back-up "on call" position.
The plaintiff outlined at trial how he arrived at the amount of pay to which he claimed entitlement. In his petition, the plaintiff sought unpaid wages for "on call" and back-up "on call" duty for four years. He claimed that he was entitled to such pay beginning on the effective date of the February 1999 memo which authorized "on call" or back-up "on call" pay for logistics supervisors. He stated that he was back-up "on call" for 196 weeks. He arrived at this figure by subtracting vacation time, claiming he was back-up "on call" for 49 weeks per year for four years. He then claimed that he was the primary person "on call" for 17 weeks. These figures exceed four years. With 52 weeks in a year, four years would only equal 208 weeks, even if no time for vacation was subtracted. When the claimed 16-weeks of primary call is considered, the amount of time for which the plaintiff claims he is entitled to payment exceeds the four years of unpaid wages he asserted in his petition.
We note that the memo from Mr. Bianchi, changing the "on call" policy to include positions such as the plaintiff's, took effect on March 8, 1999. The plaintiff resigned from Apria on July 23, 2002. Although he gave two weeks notice, he was asked to leave that day. The length of time from March 8, 1999 to July 23, 2002 is approximately three years and 19 weeks.
Even though, under the circumstances set forth in Apria's policy, the plaintiff was entitled to payment for back-up "on call" services, the calculations put forth by the plaintiff and awarded by the trial court are inconsistent with the time periods for which the plaintiff could have been back-up "on call." Accordingly, we amend the trial court judgment to award pay to the plaintiff for the appropriate amount of back-up "on call" duty. As pled by the plaintiff, we allow him 49 weeks per year back-up "on call" compensation for three years, plus the additional 19 weeks he was employed with Apria in 2002, for a total of 166 weeks at $92.50 per week. We amend the trial court judgment to provide that the amount of unpaid wages due the plaintiff is $15,355.00.

IMPEACHMENT
Apria contends that the trial court erred in refusing to admit the records of its answering service to impeach the plaintiff's claim that he had been "on call" with the company for four years. The plaintiff testified that for four years, on only one occasion was another supervisor contacted when a PST or RT did not timely answer a call. To impeach this testimony, Apria sought to introduce the daily fax messages from the answering service for two years prior to the plaintiff's resignation. Apria claims that the records show that the plaintiff received only one or two calls per month and that other supervisors at the company also received calls. The plaintiff objected to the introduction of the documents because they were not listed as exhibits on the pretrial order and they were not produced in discovery. The *426 court ruled that the documents were inadmissible.
The plaintiff issued a subpoena duces tecum to Apria's answering service for "all documents from 1998 to present pertaining to Apria Healthcare." The subpoena then listed numerous specific items pertaining to Apria. Apria's answering service faxed information to the company each morning concerning all calls received after hours. While Apria had these records, they were neither disclosed to the plaintiff in response to discovery requests nor were they listed as an exhibit on the pretrial order. The questioning of Ms. Daniel at trial showed the plaintiff's attorney asked her at her deposition about evidence relating to the plaintiff's claim for "on call" pay. Even though the records were present at that time, she did not disclose them.
Discovery is governed by La. C.C.P. arts. 1420, et seq. Under La. C.C.P. art. 1428, a party has a duty to reasonably supplement discovery responses. Courts have regularly exercised their inherent powers by imposing sanctions for failing to timely supplement discovery responses. Bozeman v. State Department of Transportation and Development, 34,430 (La.App.2d Cir.4/4/01), 787 So.2d 357, writ denied, XXXX-XXXX (La.6/29/01), 794 So.2d 813.
La. C.C.P. art. 1551 gives a court wide discretion to provide for implementation of a pretrial order and to insure that the items of the pretrial order are enforced. The theory inherent in pretrial procedure is the avoidance of surprise and the allowance of the orderly disposition of the case. The pretrial order controls the subsequent course of action, though it can be modified at trial to prevent substantial injustice. Vernon v. Wade Correctional Center, 26,053 (La.App.2d Cir.8/19/94), 642 So.2d 684. The trier of fact is given broad discretion to determine whether to modify a pretrial order. This discretion is controlled by the principle that it must be exercised to prevent substantial injustice to the parties who have relied on the pretrial rulings or agreements and structured the preparation and presentation of their cases accordingly. Absent an abuse of discretion, the trier of fact's decision will be upheld. Vernon v. Wade Correctional Center, supra.
The pretrial order shows that the documents from the answering service were not listed by Apria. The defendant argues that it did not know that it would need the impeachment evidence until after the testimony of the plaintiff. Therefore, the documents could not be disclosed. Further, this information was gathered prior to the hearing; Apria contends that it was not responsive to any request for discovery by the plaintiff and so was not disclosed.
Apria argues that it was not required to list the answering service documents because they were being used to rebut the plaintiff's claims of entitlement to "on call" wages. We find that these documents, rather than being used for impeachment, addressed the primary issue in dispute-the plaintiff's entitlement to "on call" pay.
As such, Apria was required to disclose the documents to the plaintiff and to list them on its pretrial order. Due to Apria's failure to do so, the trial court did not err in excluding the documents at trial. See Vernon v. Wade Correctional Center, supra; Offord v. Holloway Construction 567 So.2d 690 (La.App. 3d Cir.1990).

PENALTY WAGES
Apria contends that the trial court erred in ordering it to pay penalty wages in this matter. The company points out that under La. R.S. 23:632, penalty wages are to be awarded only if the failure to pay an employee is arbitrary or unreasonable.
*427 Apria denies that it acted in bad faith. Rather, it contends that it had a good faith defense to the claims of the plaintiff. Therefore, the payment of penalty wages was not justified.
La. R.S. 23:632 provides:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
This statute is designed to compel prompt payment of wages upon an employee's discharge or resignation. Boudreaux v. Hamilton Medical Group, Inc., 94-0879 (La.10/17/94), 644 So.2d 619. It is well-settled that statutory provisions that are penal in nature are to be strictly construed. In order for the employee to recover such penalty wages, the employer must be found to have acted in an arbitrary or unreasonable manner. Moore v. Fleming Subway Restaurants, 28,543 (La.App.2d Cir.8/21/96), 680 So.2d 78. Equitable defenses are available, and penalty wages are not to be absolutely imposed irrespective of the circumstances. It is only a good-faith, non-arbitrary defense to penalty wage liability which will permit the courts to excuse the employer from the imposition of penalties. Henderson v. Kentwood Spring Water, Inc., 583 So.2d 1227 (La.App. 1st Cir.1991).
Whether there exists a valid equitable defense depends on the particular facts of each case. A trial court's findings of fact with regard to whether the plaintiff is entitled to penalty wages cannot be reversed on appeal in the absence of manifest error or unless clearly wrong. Trahan v. Pousson, 497 So.2d 58 (La.App. 3rd Cir.1986).
Apparently, the trial court found that Ms. Daniel, the plaintiff's supervisor, was the one who assigned him to back-up "on call" status and then denied him compensation. In the present case, we do not find that the trial court erred in finding that the plaintiff was entitled to penalty wages.

CONCLUSION
For the reasons stated above, we reverse and vacate that portion of the trial court judgment awarding the plaintiff, Robert H. Robinson, wages for "on call" duty. We affirm the finding of the trial court that the plaintiff is entitled to additional compensation from the defendant, Apria Healthcare, Inc., for back-up "on call" work. We amend the judgment to award 166 weeks pay for back-up "on call" duty at a rate of $92.50 per week. This award totals $15,355.00. We affirm the trial court award of penalties and attorney fees to the plaintiff. Costs in this court are assessed to the defendant.
REVERSED AND VACATED IN PART; AMENDED IN PART; AFFIRMED IN PART.
CARAWAY, J., concurs in part and dissents in part with written reasons.
CARAWAY, J., concurring in part and dissenting in part.
I respectfully dissent from that portion of the majority's opinion affirming the trial *428 court's award for on-call wages at the back-up rate of pay. The portion of the opinion reversing the trial court's award for 16-17 weeks of on-call duty is correct, since Robinson never showed himself to be on-call.
The employment relationship is a matter of contract requiring an agreement of the parties. La. C.C. arts. 2746, et seq. and art. 1906. A critical element for a valid contract is the parties' mutual consent or meeting of the minds. In this case, the agreement that must be found was one of modification of the obligations of the parties' existing contract whereby Robinson had agreed for a set salary to perform managerial duties, including the same duties for which he now seeks additional wages. Despite Apria's unilateral expression of policy on February 9, 1999, Robinson continued to work for over three years for the same salary with his existing understanding of the employment contract. There was no meeting of the minds for a modification agreement, no offer by Apria, no acceptance by Robinson. La. C.C. art.1927. This suit therefore is Robinson's attempt to prove that Apria intended for him a clear and unambiguous offer which he now belatedly desires to accept after the parties' contract had long been performed under a different agreement.
Aside from Apria's disputed policy statements, Robinson's managerial role as logistics supervisor was documented through the following written agreements of which he was aware. Robinson's job description stated that he was responsible for "scheduling and dispatching of Patient Service Technicians on a daily and on-call basis." An off-hour or weekend period would be the on-call period during which he was to locate and dispatch a PST who did not immediately respond to the answering service call for a job. If the PST could not be found, Robinson would talk directly with the client. Yet, remarkably, he rarely was required to go to the client's home, and consequently, he seeks no call back pay in this suit. Before February 9, 1999, in accordance with his written job description, he was performing this dispatching duty on an on-call basis in his management role without extra pay. His consent to that salaried contract is clear.
Apria's employee handbook, revised in May 1999, did say that certain categories of exempt employees were "to be `on-call' or `called-back' to perform emergency work" and concluded, "your supervisor will inform you if you are eligible for on-call pay." Robinson said he asked, was told he was not eligible, and the record shows that he continued performance with his activities in taking off-hour calls. Also, stated in receipts for the handbook signed by Robinson is the following: "[T]he rules, policies and benefits contained in the employee handbook may be changed, modified, or deleted at any time," and "I understand that neither this handbook nor any other communication by a management representative is intended in any way to create a contract of employment." Therefore, on the one hand, from the documents to which he was privy, he was told that until his supervisor told him that he was entitled to more than his salary, that's all he got. On the other hand, from the corporate policy document he never saw, he now claims more. Significantly, Robinson does not allege that his supervisor's denial of on-call pay was an act of fraud or that he was discriminated against as an employee in a protected class.
Before considering Apria's written policy documents, the first important point that should be recognized is that Robinson's intent concerning those written documents is irrelevant. He never saw them. Apria is not estopped for Robinson's reliance upon the never-communicated expressions *429 of its policy. Apria alone may construe whether its involved policy statements governing its nationwide organization were intended to apply to Robinson's role in its Shreveport branch.
Robinson Exhibits 6 and 8 reflect (i) the April 1, 1998 Policy Manual provision on "Compensation-On Call and Call Back Pay," (ii) the February 9, 1999 Bianchi memo reflecting changes to the Policy Manual on that subject, and (iii) the August 1, 2002 Policy Manual on the same subject. In general, these documents affirmed that most exempt positions were ineligible for on-call pay and that designation of on-call employees was to be based upon the business necessity of the particular branch office. Yet, a construction of the policy for an exempt/management/supervisor in Robinson's position is that he could be on-call, entitled to either a full on-call rate or a back-up on-call rate. It is significant that the title to the section on Compensation does not list three categories, "On Call, Back Up On Call, and Call Back Pay." An exempt salaried employee had to first be scheduled in the on-call role for which he would then become entitled to either a full on-call rate of pay or a back-up on-call rate. Robinson was never scheduled in the Shreveport office as on-call.
There is one caveat in these Policy Manual documents which states that the exempt employee gets either the full on-call pay rate or the back-up on call rate "for relief purposes only." Unilaterally, what did the company mean by this? Would an exempt manager like Robinson, as a part of his salaried duties, continue to take on-call calls in situations which are not for "relief purposes?" My review of the record convinces me that the two Apria management witnesses offered a good faith expression of the company's intent for a limited application of the new policy after April 9, 1999, "for relief purposes only" and that the small Shreveport office did not pay any of its salaried supervisors under this policy.
First, no other management personnel in the Shreveport area branch apparently ever got on-call pay, either at the full rate or "back-up" rate. Yet, they were also taking some phone calls and tracking down the scheduled on-call non-exempt responders, if at no other times, when Robinson was on vacation. The explanation of this policy by the Apria management witnesses stated that there remained for all exempt/management, the general salaried duty of receiving off-hour calls after the primary/non-exempt/ responders, who were in fact on-call, would not respond to the initial page. Second, the policy of "for relief purpose only" would override this general salaried duty to receive calls if Robinson had ever been on-call formally (i.e., for relief purposes), in that he was the first line responder, filling in for a non-exempt employee because of a sporadic shortage of PSTs, or in other words, in "emergency relief." Third, the routine schedule of the on-call non-exempt responders was posted monthly, and since only non-exempt employees showed up on the list, Robinson would be required to request a true on-call status in situations of such emergency relief purposes. Since the back-up personnel would need to know that Robinson was to be the on-call responder, evidence of corporate records documenting his on-call status should have been presented.
Next, the confusion with the written policy language surrounds the column "Back-up On-call Rate" and the language, "Back-up shall mean subject to secondary, not primary call." In the non-exempt employee role this is easily understood. If the primary on-call responder does not respond, the back-up is paid at a flat rate to *430 back him up, and if the back-up travels to the customer, he also receives call-back pay. Even though the new policy of February 1999 expressly addressed this situation, there was no testimony that two non-exempt employees were ever scheduled in the Shreveport office for a weekend or otherwise as being on-call and back-up on-call. The Apria witnesses indicated that this could occur in the much larger Apria branches around the nation where numerous clientele created the greater possibility that two PSTs would be needed to respond to two homes simultaneously. In Shreveport, with few non-exempt employees, the management personnel were the only back-ups and they seldom if ever responded by going to a patient's house. Shreveport did not have a scheduling practice of listing two non-exempt employees (an on-call and a back-up on-call). Back-up in the large branch sense meant back-up responders going to client homes, and that role was never needed in Shreveport.
This long and detailed explanation of Apria's view of its nationwide policy was undisputed at trial and therefore did not present to the trial court a fact issue which this court must now review under the manifest error standard. This was Apria's unilateral intent to pay extra compensation to salaried employees in circumstances that varied internally within the company. Robinson did not understand that uncommunicated policy any differently nor rely on it to his detriment, thinking his existing salary contract was modified. He never accepted Apria's offer to pay him more because he never knew about it and Apria never intended it. Apria presented to the trial court its one-sided view of its policy which cannot be said to be totally unreasonable, fraudulent or discriminatory. Robinson received what he bargained for both before and after April 9, 1999, and proved no contractual modification in his employment by an offer from Apria which he accepted.
NOTES
[1] We are cognizant of the general rule that an employee handbook does not create a contract between an "at will" employee and his employer. Keller v. Sisters of Charity of the Incarnate Word, 597 So.2d 1113 (La.App. 2d Cir. 1992); Stanton v. Tulane University of Louisiana, XXXX-XXXX (La.App. 4th Cir. 1/10/01), 777 So.2d 1242, writ denied, XXXX-XXXX (La.4/12/01), 789 So.2d 597. Neither party disputes that the compensation guidelines found in the memo and handbooks would apply to the plaintiff under the specified circumstances. The question presented is whether the plaintiff showed that he met the requirements to receive additional compensation.
[2] We note that the plaintiff resigned from Apria on July 23, 2002, before the date of this policy manual.
[3] Apria also provided payment for PSTs and RTs who were actually called out into the field after hours to handle patient needs. This is referred to as "call back" pay. The plaintiff does not claim that he was ever required, as a supervisor, to go to a patient's residence. Therefore, there is no claim before us for "call back" pay.
[4] Mr. Fletcher, Mr. Patricola and Ms. White had each secured counsel regarding employment disputes with Apria.