DREW, J.
Lin their action for past wages, penalties and attorney’s fees, Oklahoma residents Joe and Terrie Lynn Gaddy sued Universal Cable Systems, International Mapping Technologies, Inc. (“IMT”), and Universal Collection Systems, Inc.[1] Plaintiffs sought wages of $3,007.07,[2] including deductions made for liability insurance along with statutory penalties plus judicial interest, costs and attorney’s fees under La. R.S. 23:631, et. seq.
The Gaddys worked in New Orleans auditing households to determine if unauthorized[3] Cox Louisiana, L.L.C., (“Cox”) television hookups were in service and to sell Cox television subscriptions to unauthorized users and those residents without cable service. After plaintiffs worked one month, the Cox cable contract for auditing services with Universal Cable was terminated and the Gaddys’ work was no longer *878 required. Following the Gaddys’ unsuccessful attempts to collect wages they asserted they were owed, they filed this suit.
After hearing testimony and reviewing multiple exhibits, the trial court determined that the Gaddys were employees of IMT and granted them judgment against IMT for $2,860.95. The trial court rejected the Gaddys’ demands for repayment of liability insurance premiums deducted from their pay and for penalties under La. R.S. 23:632. The judgment granted judicial interest from the date of judicial demand (November 6, 2009) until paid in full, plus all costs of the proceedings. The trial court granted to plaintiffs attorney’s fees of 12$15,000.00. The trial court rejected the Gaddys’ demands against Universal Cable and Universal Collection.
The Gaddys have appealed, contesting the dismissal of Universal Cable and Universal Collection as defendants, the finding that the defendants reasonably withheld insurance premiums from their wages and commissions, the denial of their claim for penalty wages; and requesting additional attorney fees for taking this appeal. None of the defendants have appealed, but Universal Cable and Universal Collections have filed a brief seeking affirmance. IMT has filed no brief. Plaintiffs did not complain about the trial court’s calculations which were primarily based upon the Gaddys’ research, computations, and testimony. Therefore, we will not revisit those figures.
We conclude that the trial court committed manifest error in denying the Gaddys’ request for penalty wages; we amend the judgment to assess penalty of $26,663.40[4] against IMT. We also award additional attorney fees of $2,500 against IMT. In all other respects, the judgment is affirmed.
BACKGROUND AND TESTIMONY
The record contains an “Independent Contractor Agreement” between Cox and Universal Cable Systems, Inc., which was represented by its president, Jim Moton, as signatory in July 2009. Universal Cable contracted to furnish cable use verification services for Cox in New Orleans subsequent to the 2005 Hurricane Katrina. In a contract executed thereafter, Universal Cable 1..¡contracted with IMT for it to perform the audit of Cox cable services in Louisiana (verifying accounts, account services, and sale of additional services).
President of two separate corporations, Universal Cable Systems and Universal Collection Systems, Inc., both located at the same Memphis, Tennessee address, James Moton testified that after Universal Cable contracted with Cox to perform audit services, Eddie Shaw, an officer in Moton’s company, placed an ad on cable-bar.com. Moton explained that any potential worker who contacted Shaw was referred by Shaw to personnel of IMT which actually hired the workers.
Joe Gaddy described cablebar.com as a networking site for its members working in the cable industry. According to Gad-dy, he first spoke with Eddie Shaw, who referred Gaddy’s inquiry for employment to someone who contacted him by phone a number of days later. Phone records showed that Gaddy also spoke with Tom McMillen. Basically hired via telephone, the Gaddys were instructed to sign authorizations and releases for background checks and drug screens and to report to *879 New Orleans for work starting July 29, subject to favorable background checks and drug screens.
The “Authorization and Release” for background checks and drug screens signed by the Gaddys was labeled “Universal Collection Systems, Inc.” Moton testified the form “probably should have said Universal Cable” which had the checks and tests performed on behalf of IMT. Moton’s company had contracts with companies to conduct background checks and perform drug screens on potential workers. The results of both tests were sent to Universal Cable. Moton testified that 95% of his business activity related to television cable and only 5% dealt with collections.
LMoton explained that the New Orleans audit project was a visual audit in which workers observed the physical hookup on the telephone pole or pedestal in the yard to determine whether or not television cable was installed at a particular residence. Workers were given a list of non-subs (persons who did not have cable, never had cable, or had their cable disconnected). If a nonsub scribing home was connected to cable, the worker went to the door and attempted to sell the resident Cox cable service. If the resident made the purchase, the worker called in the sale to Cox and the cable service was left on. If the resident refused to buy cable or was not at home, the cable service was disconnected by audit workers, who left a door tag with contact information for purchasing cable service.
Moton’s company owned Palm Pilot devices, which were pre-loaded with locations to be worked on a particular day. These devices were distributed daily by the IMT project supervisor, Ralph Boykin, to the audit workers who input sales, disconnects and ok status of assigned locations each day. At the end of the day, the workers returned the devices to IMT which in turn delivered them to Universal Cable’s personnel. Steve Phillips was Universal Cable’s onsite supervisor who printed a “daily hot sync sheet” from the Palm Pilots, which revealed what the worker had done each day with what results. Phillips electronically transmitted the work results to Cox, which then conveyed the next day’s assignments which were loaded onto the devices which were returned to IMT whose supervisor, Boykin, distributed the devices to the audit workers the following morning. Phillips served as a link for Cox, Universal Cable, and IMT. Boykin described Phillips as the Universal Cable person for whom he worked on this job.
IsMoton also identified a shirt worn by the New Orleans workers with the imprint:
UNIVERSAL CABLE
CONTRACTOR FOR COX
COMMUNICATIONS
Moton acknowledged receiving emails from the Gaddys after the project terminated in early September 2009. Therein, the Gaddys complained about the amount of compensation they received and asserted they were entitled to more payment for work done. Moton responded via email that he did not know what the Gaddys’ compensation arrangement was with IMT, but that Gaddy had no agreement for compensation with Universal Cable. He informed the Gaddys that he would check with IMT to see if he could be of assistance. He never issued a check to the Gaddys.
Tom McMillen testified that IMT was responsible for paying the Gaddys and that IMT’s accountant in Staunton, Virginia, did the payroll for and mailed the paychecks to the New Orleans audit workers. Joe Gaddy signed a W-9 prepared by IMT’s accountant. McMillen stated and Joe Gaddy confirmed there was no written *880 agreement with the Gaddys concerning their New Orleans work.
After the project ended around September 1, 2009, McMillen stated he began receiving the Gaddys’ complaints about not receiving all payment they were due. According to McMillen, the amounts demanded did not match the records he had received. McMillen also cited deficiencies on the parts of Boykin and Phillips as delaying factors in resolving the dispute. McMillen repeatedly requested that the Gaddys supply documentation of their claims. On ^September 25, McMillen offered to pay the Gaddys what the company admitted owing them.
The parties jointly placed the deposition of Ralph Boykin into evidence. Having worked as an independent contractor for IMT for seven to eight years, Boykin stated he was IMT’s project manager for the New Orleans audit and served as a liaison between Universal Cable and IMT. The majority of IMT’s work was through Universal Cable, which performed audits for a number of cable television companies. On behalf of IMT, he hired independent contractors to work as subcontractors for IMT performing the audit in the field.
Although assisted in New Orleans by his wife, Terrie Gaddy, only Joe Gaddy received payment from IMT. Testimony was that cable audit workers used wives or girlfriends as drivers or assistants, who were not paid workers. For security reasons, Terrie Gaddy was issued a Cox identification badge as an explanation of her presence on property being audited. Because he knew that Terrie Gaddy assisted with sales of cable service, Boykin also issued her an identifying tech number for paperwork; however, she did not conduct audits. Terrie Gaddy stated that the amounts the Gaddys sought in the litigation covered the work done by both Gad-dys. Her acknowledgment make a nonis-sue of the Gaddys’ complaints in brief about Terrie’s not being paid directly.
Stating he provided no training to the Gaddys, Boykin said another subcontractor showed them how to operate the Palm Pilots. The Gaddys asserted they were trained by defendants. Boykin distributed the Palm Pilots to the audit workers approximately 7:00 a.m. at a hotel in Metairie and collected them around 7:00 p.m. each day. In addition to giving the workers the Palm Pilot, Boykin also gave them a hard copy of their work assignment as backup in 17case the PDA malfunctioned. Boykin also asserted the audit workers were always to keep a hard copy of their sales reports. If audit workers needed copies of sales records, Boykin stated he made copies for them.
According to Boykin, each worker determined the order in which to conduct his or her daily assignments. Boykin described his supervision of audit workers by IMT as “quality control” which included determining whether the workers used the correct colored tags, were properly removing traps (apparently, equipment that controlled the amount and type of channels available to a subscriber), and made sales at a particular address. Boykin also reported that he communicated to the Gad-dys how they would be paid commissions and the rates for different tasks performed. Boykin denied that the company set hours in which work was performed but acknowledged work could not commence before 8:00 a.m. Workers also had to leave the field by 8:00 p.m.
As to equipment used for the audit, workers were required to have a truck, a 28' ladder, and disconnect equipment. Universal Cable owned the Palm Pilots which were supplied to IMT to use in the audit. According to Boykin, IMT provided the Gaddys with signs from the cable company, magnetic signs for the vehicles, plus *881 traps, ties and tags. Gaddy stated that Cox provided a certain disconnect tool.
Boykin took the audit workers to the Cox facility to obtain ID badges to work on the audit. Boykin stated that both Jim Moton of Universal Collection and Steve Phillips from Universal Cable were present when the security badges were distributed to the workers. Everyone listed Universal Cable as their employer when they obtained the badges from Cox. Boykin also admitted his | ^confusion as to which Universal entity was contracted with Cox. His testimony did not appear to distinguish clearly between Universal Collection and Universal Cable.
During the audit, Boykin admitted Gad-dy contacted him “a couple of times” about discrepancies in his pay. The Gaddys also complained to him about unpaid sales commissions. Their paycheck was also late a couple of times. If a discrepancy was found, Boykin notified McMillen. Generally, he thought the matter was resolved because he did not hear back from anyone. After the work ended and the Gaddys complained about nonpayment, Boykin informed McMillen if IMT had made an error on the Gaddys’ pay or reported to McMillen that he could not find a discrepancy. Boykin referred payroll questions to McMillen.
A longtime worker in the cable television business, Joe Gaddy traveled to various locations working in different capacities in that industry. In some locations, he was accompanied and assisted by his wife. While wording as a subcontractor for Foster Cable Company in Ruston, the Gaddys saw an internet ad on cablebar.com labeled “Audit/Sales” with Preferred Hiring Terms “Independent Contractor.” The text of that notice was placed into evidence at the trial. The contact person for information was “Eddie at 901-869-2624” or by a link to an email address. Qualifications set out in the ad were “Must be able to pass background check, drug screen and have a valid driver license.” Applicants were required to have a truck, a 28' ladder and disconnect tools. The job description was “Non Sub Sales Audit, ability to sell is a key. Must disconnect if no sale is made.”
|9In late July, the Gaddys reported as directed to New Orleans. Beginning July 31, they worked in New Orleans but picked up equipment and work assignments in Metairie each day. At the end of each day, they returned the equipment to Metairie. Defendants’ agents informed the Gaddys they would receive additional pay based upon a “commission schedule.”
The Gaddys stated that the defendants assured them that they would be paid for sales arising from their contacts with residents in their assigned work areas. If a home had an unauthorized cable connection or no cable connection, the plaintiffs contacted the resident to sell cable service. Resulting sales were called into the Cox Communication call center. If a resident was not present or refused to make a purchase, Gaddy disconnected any unauthorized hook-up and left a door tag with a Cox phone number for the resident to call. If a customer Gaddy disconnected later called Cox to acquire cable service, that person would be on daily reports as Gad-dy’s customer for whom Gaddy was to receive compensation for the sale.
Gaddy also described the procedure for ' returning to an address to check whether the customer was paying for the services he was receiving. Because defense agents failed to properly report the data to Cox, the Gaddys contended they were not paid for all the sales and work accomplished and they were not paid correctly according to the information they supplied their supervisors.
*882 The Gaddys say they were terminated without notice on September 1, when the contract one or more of the defendants had with Cox Communications was “not renewed.” According to Gaddy, he did not know for whom he was working but everything he saw “had Universal on it.” Gad-dy stated he signed Imthe W-9 after he had begun working in New Orleans. He also signed paperwork stating he was employed by Universal Cable in order to get his badge.
Before work each day, he met with Boy-kin at the hotel. Initially, the PDAs did not work correctly so they used paper instructions. Two or three days later, they began using the Palm Pilots. If they arrived late, they were reprimanded. There was no option to change work areas on a given day. Gaddy stated he had to obey everyone, including Boykin and Steve Phillips.
Gaddy stated they were not timely paid for their sales. Initially, Gaddy was paid for his audits but not for sales made. McMillen did not pay on the day he had told Gaddy payment would be made. Gad-dy said payments were inaccurate from the beginning and that his first paycheck came from Oklahoma City and was issued by IMT.
When leaving door tags, the Gaddys initially included a local phone number supplied by Boykin, which was answered by Boykin’s wife in Alabama. However, they were unsuccessful in getting sales credit for some calls customers made to that number. When the Gaddys left their own phone number, they made a lot more money from called-in sales. In Gaddy’s view, IMT exercised so much control, there was no option to be a contractor.
Gaddy had no written contract with IMT. Gaddy did not care whether he was working for IMT or Universal Cable. After the job ended, Gaddy wrote Moton that his pay had been shorted approximately $1,600. Although told by Moton and/or McMillen that there would be no disconnects in the audit, Gaddy stated that disconnecting was necessary to get a sale. Among his job duties wasJjjattempting to contact unauthorized customers, turn in U/A forms, and make a visual audit.
To determine how much they were owed, the Gaddys maintained a running sales total which they compared periodically to the hot sync totals from the Palm Pilots. They did not bill for regular pay but made submissions to IMT when the payments they received were incorrect. The Gaddys prepared a spreadsheet submitted September 8. “Invoices” referred to in the Gaddys’ emails were prepared to cover discrepancies in payments. In an email to McMillen, Gaddy stated they had been paid only for 14 out of 51 sales they made. On September 15, Gaddy wrote McMillen that the deal regarding payment was between Gaddy and “your company (IMT).” On December 23, IMT’s attorney sent the Gaddys $762.97 and a release.
Gaddy explained that his September 18 email to Jim Moton stating he worked for Tom McMillen of IMT in New Orleans and would sue for “breach of contract” was his attempt to get paid for the work done. A September 22 email from McMillen to Gaddy stated he was trying to resolve the discrepancy in their figures.
In a September 30 email, Gaddy claimed $2,664.07 was due him. Gaddy explained that he calculated sales for which he was not paid by returning to addresses he had disconnected. If the location had service, he called Cox to verify the level of service purchased and obtained the account number from Cox.
Gaddy understood there were two levels of payment: one for sales at the door and another for customers who called into Cox. *883 Returning to cut off residents who had unauthorized cable service was, Gaddy acknowledged, not | ^authorized work included on the Palm Pilot daily assignments. He returned to check on cable service on his own. Gaddy explained that frequently when he returned to complete a sale, he would check a nearby location that he had previously disconnected. Gaddy stated he worked off the Palm Pilot instructions every day. Gaddy said all his disconnects were made at the side of the house and not on the pole itself.
Compared with work he did under contract for Foster in Ruston, Gaddy stated that beginning work at 7:00 a.m. and turning in equipment at a particular time each day was required for the New Orleans work. Initially, Gaddy thought he worked for Universal Cable because his paycheck was the only thing that stated IMT. In contrast to Boykin’s testimony about sales records, Gaddy was not allowed to keep any of the four sales receipt copies; the only sales for which he had records were copies Boykin made of some Gaddy sales.
Terrie Gaddy testified she prepared the spreadsheet submitted by correlating everything she got from the job including route sheets, audit tag sheets, Cox information, customer information plus anything else they had. Terrie also described the personal records and notes she kept of the couple’s daily activities. All the information came from the work done on the New Orleans audit. After August 15, Boy-kin stopped giving them copies of their daily sync sheets.
Terrie explained their payment demand by stating they earned $7,294.00 while working and were paid $5,511.00, leaving a balance of $1,783.06 plus $1,260.50 from sales commissions for Cox cable service for a total of $3,043.56. She obtained the data from red tag sheets concerning sales called into Cox for which they had not been paid. When the Gaddys realized they | iswere not being paid as they should have been, they started making copies of records. The average daily rate of $305.53 was calculated by dividing 26 or 28 working days into $8,554.00, the sum of the pay they received plus the amount they asserted they were due.
Terrie said for whom they worked was, ‘Tour guess is as good as mine.” They took orders from everyone: Ralph Boykin on a daily basis, Steve Phillips was seen occasionally and gave directives, and they spoke with Jim Moton once.
Terrie also explained that the couple were paid only for those audits listed on the PDA. They were not paid for any other locations audited in the area they were working. However, Cox was very interested in any locations where people were stealing cable service. Although they were told the work was a visual audit only, the only way they could make sales was to disconnect unauthorized users after they had verified the location was not a Cox subscriber. If they made a sale to such an unauthorized user at a location not listed in the PDA, Terrie asserted they were absolutely entitled to be paid for that sale.
REASONS FOR JUDGMENT
In written reasons, the trial court found that Cox entered an independent contractor agreement on July 14, 2009, with Universal Cable for the latter to perform an audit of Cox’s cable service in New Orleans. On August 4, 2009, Universal Cable entered a contractor agreement with IMT for the actual performance of the audit; Tom McMillen signed this agreement on behalf of IMT. Thereafter, someone at IMT placed an ad for an audit/sales position described as an “independent contractor.”
*884 | uWorking in Ruston at the time, the Gaddys responded to the ad and drove to New Orleans, where they worked from approximately July 29 until September 1, 2009. On that date, Cox terminated its agreement with Universal Cable.
The Gaddys claimed that they were still due $3,043.56 for sales, audits and improper insurance deductions, plus 90 days’ penalty wages at the rate of $305.53 per day, reasonable attorney fees, judicial interest and all costs.
The court noted that the application of R.S. _ 23:631-632 depended upon finding that the Gaddys were employees, not independent contractors, a factual determination made on a case-by-case basis. White v. Frederick, 44,563 (La.App.2d Cir.8/19/09), 17 So.3d 1016, writ denied, 2009-2059 (La.11/25/09), 22 So.3d 168. The court performed an intricate analysis of the evidence. The trial court reviewed the factors in Hickman v. Southern Pac. Transport Co., 262 La. 102, 262 So.2d 385 (1972), which denoted what constitutes an independent contractor relationship. The relevant query and important issue are whether the principal retained the right to control the work, not the actual supervision and control exercised. An independent contractor has freedom of action and choice when undertaking the work and a legal responsibility if the work is not done according to the contract. Hickman, supra.
The trial judge found that the relationship between the Gaddys and IMT was one of employer/employee, not principal/independent contractor, in spite of the facts that (a) the Gaddys’ position was advertised as an independent contractor, (b) no taxes were withheld for the Gaddys’ pay, and (c) payments were reported on a Form 1099 and not a W-2. Relying upon the “Scope of 11fiWork” attached in evidence,[5] the trial court listed the duties and responsibilities of field auditors.
*885 Upon discharge or resignation of an employee, R.S. 23:681 required the employer to pay the amount then due under the terms of employment on or before the next payday or no later than 15 days following discharge, whichever occurs first. A penal statute which must be strictly construed, R.S. 28:632 mandates that any employer failing to comply with R.S. 23:631 is liable to the employee for 90 days’ wages at the employee’s daily date of pay or full wages from the demand for payment until the employer tenders the amount of unpaid 11(iwages, whichever is less. Penalty wages are imposed only if the employer is in bad faith or unreasonable; if the employer has an equitable defense, no penalty can be imposed. Glover v. Diving Servs. Int’l, 577 So.2d 1103 (La.App. 1st Cir.1991).
The court considered the Gaddys’ claim that they were still due wages of $3,043.56, and IMT’s audit setting unpaid wages at $762.91. The court accepted the Gaddys’ calculations but deducted 6% for mandatory insurance coverage, awarding total unpaid wages of $2,860.95. The court found that the Gaddys were aware of the mandatory insurance coverage and disputed that they really needed it, but that this was a valid deduction and created a bona fide dispute precluding the award of penalty wages.
Finally, the court noted that reasonable attorney fees were due if the employee files a well-founded suit for unpaid wages, even if penalty wages are not imposed. Cleary v. LEC Unwired, 2000-2532 (La.App.1st Cir.12/28/01), 804 So.2d 916. The court awarded the Gaddys $15,000 in attorney fees, together with costs and interest from date of judicial demand until paid.
DISCUSSION
La. R.S. 23:631, Discharge or resignation of employees; payment after termination of employment, provides, in pertinent part:
A. (l)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.
(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under 117the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.
(2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee’s or laborer’s current address as shown in the employer’s records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official United States postmark or other official documentation from the United States Postal Service.
As noted by the trial judge, application of this statute depends upon finding that the person seeking unpaid wages is an *886 employee, a decision made upon the facts of each case. See Tower Credit, Inc. v. Carpenter, 2001-2875 (La.9/4/02), 825 So.2d 1125. In Hickman, supra, the Louisiana Supreme Court explained the independent contractor relationship:
connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants. The relationship presupposes a contract between the parties, the independent nature of the contractor’s business and the nonexclusive means the contractor may employ in accomplishing the work. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor’s own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
The law further recognizes that inquiry to determine whether a relationship is that of independent contractor or that of mere servant requires, among other factors, the application of the principal test: the control over the work reserved by the employer. In applying this test it is | iRnot the supervision and control which is actually exercised which is significant, the important question is whether, from the nature of the relationship, the right to do so exists.
Hickman, supra, at pp. 390-891. Citations omitted.

Gaddys’Status with IMT

We find no manifest error or clear wrong in the trial court’s factual finding that the Gaddys were employees of IMT. Although they were informed they were independent contractors, the Gaddys set out numerous examples of their labor being under the direct control of the IMT: where, how, and when they worked was controlled; Boykin provided training them for PDAs; the Gaddys supplied regular and daily reports; Joe Gaddy was paid at regular weekly intervals; the Gaddys worked solely on the audit from July 29 until September 1; and the Gaddys could have been fired at any time or quit at any time.
Besides directing the activities to be performed during the audit, Boykin, the IMT project supervisor, required the workers at an appointed time to pick up their daily instructions containing locations to be worked on a particular day and mandated that the PDAs be returned to Boykin at the same location in Metairie at a particular time. The Gaddys stated they were reprimanded if they did not comply with the times as dictated for beginning and ending work and for receiving and returning the PDAs.
Although Boykin stated the workers were free to decide in what order they audited each address, the locations themselves were carefully assigned each day on the PDAs distributed by Boykin. Gaddy stated the audit workers had no flexibility in deviating from the locations contained on the PDAs. Moreover, the workers had no flexibility to request different location | ^assignments if they were given a area which produced few sales. What Boykin described as “quality control” was in reality his close supervision of the tasks performed by the Gaddys including determinations that they properly used door tags and removed traps on cable service and *887 verifications that they made sales at a particular address. In this case, IMT not only reserved the right to closely supervise and control the Gaddys’ labor, but also actively exercised that control and supervision. The trial court’s conclusion that the Gaddys were IMT employees is neither clearly wrong or manifestly erroneous.

Gaddys’ Status with Universal Defendants

The Gaddys contend on appeal that they were employees not only of IMT but both Universal defendants. The Gaddys seek to rely on the fact that the forms consenting to the drug and background checks were labeled “Universal Collection.” These forms were signed so that checks could be performed to ascertain whether the Gaddys were eligible to work as auditors. Although labeled Universal Collection, Moton stated that Universal Cable was the company involved in this cable audit. Both Moton and Boykin explained that the actual hiring was done by IMT.
Notwithstanding the Gaddys’ claim that they obeyed orders given by Steve Phillips of Universal Cable who coordinated between IMT and Cox Cable in New Orleans by servicing the Palm Pilots, the Gaddys provided no evidence of what type of instructions or when such instructions were ever given them by Phillips.
Universal Cable has a contractual relationship with Cox to provide the New Orleans audit. Universal Cable in turn subcontracted to IMT which actually performed the audit. Testimony is that both Universal Cable and IMT, 12pthrough Ralph Boykin, placed ads for workers. However, the contacts to Universal were referred to IMT whose personnel, McMillen and Boykin, spoke with and hired workers. The record does not establish that the Universal defendants retained any right to control the Gaddys’ work on the audit. Nor is there any evidence that any actual supervision by the Universal defendants took place. We find no clear wrong or manifest error in the trial court’s conclusion that there was no employment relationship between the Gaddys and the Universal defendants.

Single Business Entity

For the first time on appeal, the Gaddys argued that the Universal defendants operated as a single business entity with the result that they were all employers of the Gaddys. In Town of Haynesville, Inc. v. Entergy Corp., 42,019 (La.App.2d Cir.5/2/07), 956 So.2d 192, 198-199, writ denied, 2007-1172 (La.9/21/07), 964 So.2d 334, this court noted that under Louisiana law, corporate separateness is recognized and respected. Piercing the corporate veil is described as a radical remedy employed only in exceptional circumstances. Piercing the corporate veil on the basis of the “alter ego” theory involves considering five factors: (1) commingling of corporate and shareholder funds, (2) failure to follow statutory formalities for incorporating and transacting corporate affairs, (3) undercapitalization, (4) failure to maintain separate bank accounts and bookkeeping records, and (5) failure to hold regular shareholder and director meetings. This record contains no evidence establishing the presence or absence of the foregoing factors or the existence of exceptional circumstances which would have supported finding a single business entity among these defendants.

12iPenalties

La. R.S. 23:632 provides for the imposition of penalties on employers in certain circumstances:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee *888 either for ninety days wages at the employee’s daily rate of pay, or else for full wages from the time the employee’s demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
In Smith v. Acadiana Mortg. of Louisiana, Inc., 42,795 (La.App.2d Cir.1/30/08), 975 So.2d 143, 149-150, this court explained the imposition of penalties in suits for unpaid wages:
In order to recover penalty wages and attorney fees under LSA-R.S. 23:632, the claimant must show that (1) wages were due and owing; (2) demand for payment was made where the employee was customarily paid; and (3) the employer failed to pay upon demand.
An employee is entitled to recover penalty wages if he or she proves that the employer acted in an arbitrary or unreasonable manner. Penalty wages are penal in nature and must be strictly construed. La. R.S. 23:632 was designed to compel prompt payment of wages upon an employee’s discharge or resignation.
A claim for penalty wages under La. R.S. 23:632 may be defeated by an equitable defense. However, it is only “a good-faith, non-arbitrary defense to liability for unpaid wages, ie., a reasonable basis for resisting liability,” which permits a court to excuse the employer from the imposition of penalty wages.
An employer’s reliance on an unlawful company policy does not constitute a good faith, non-arbitrary defense to liability for unpaid wages under La. R.S. 23:632. However, Louisiana courts have recognized that an employer’s claim of setoff, or compensation, constitutes an equitable defense to a penalty wage claim.
Smith, supra at pp. 149-150. Citations omitted.
Whether there exists a valid equitable defense depends on the particular facts of each case. A trial court’s findings of fact with regard to whether the plaintiff is entitled to penalty wages cannot be reversed on appeal in the absence of manifest error or unless clearly wrong. Robinson v. Apria Healthcare, Inc. 38,438, (La.App.2d Cir.5/27/04), 874 So.2d 418. While the trial court denied penalties based on its finding of a “bona fide dispute,” the Gaddys contend that all of the defendants should pay penalties due to their arbitrary and capricious actions in dealing with the Gaddys.
A. 6% Deduction for Liability Insurance Premium
According to the Gaddys, the 6% deduction made for liability insurance coverage was unauthorized and was per se arbitrary. The Contractor Agreement between Universal Cable and IMT required that all workers have general liability insurance. The Independent Contractor Agreement between Cox and Universal Cable required that all personnel have liability insurance. Boykin stated he informed Gaddy about the mandate that audit workers have liability insurance. The alternative options Boykin presented to the Gaddys were: (1) the Gaddys could provide certification of their own personally obtained liability coverage, (2) the Gad-dys could purchase personal liability cover *889 age and provide proof of insurance, or (3) the Gaddys could have a 6% deduction made from their pay for their coverage on IMT’s liability insurance coverage. Pursuant to a verbal agreement, Boykin said that Gaddy chose the 6% deduction from earnings. Gaddy testified that he disagreed with the need for liability insurance but was informed that the insurance was a requirement in border to have the job. Joe Gaddy was emphatic in his opinion that liability insurance was unnecessary because it was his opinion that audit workers did nothing that could result in liability.
The trial court accepted Boykin’s statement that the Gaddys opted for the 6% deduction to work on the audit. The trial court’s view that the Gaddys could have “negotiated a better agreement or simply declined employment” was unfortunately harsh in light of the contractual mandates that audit workers have liability coverage. Just as audit workers were required to have a truck and certain other equipment, they also had to be covered by liability insurance to perform the audit. IMT’s deduction for the insurance premium for mandated coverage cannot be characterized as arbitrary.
B. Defendants’ Failure to Produce Requested Records
The Gaddys also argue that the defendants’ repeated refusal to supply the requested documentation of sales and other compensable activities was intentional and demonstrated lack of candor and bad intent justifying imposition of severe penalties. However, trial commenced without any objection on that issue being made by plaintiffs. Moreover, the records of this court contain no indication that the Gaddys sought supervisory relief based upon the defense’s recalcitrance in providing requested sales records. At trial, the Gad-dys introduced into the record a large notebook filled with calculations based upon their own self-generated records and information and records obtained from the defendants. The trial court essentially adopted the figures produced by the Gad-dys in casting IMT in judgment. Thus, the Gaddys waived their complaints about any deficiency on the part of any defendants to provide materials.
C. Arbitrary and Unreasonable Delay
124An appellate court may not set aside a trial court’s finding of fact absent manifest error or clear wrong. The reviewing court should not substitute its opinion for the conclusions made by the district court, which is in a unique position to see and hear the witnesses as they testify. Robinson, supra. While the trial court denied La. R.S. 28:632 penalties based upon its conclusion that a “bona fide” dispute existed, we, with respect, conclude that the trial court was clearly wrong in denying penalties to the Gaddys under these particular facts.
All the witnesses testifying as to the Gaddys’ pay acknowledged that there was disagreement as to the amount owed. The basis on which we find that the trial court erred was that their employer, IMT, was arbitrary and unreasonable in its unconscionable delay in resolving the pay problem that had been brought to the attention of IMT’s project supervisor in New Orleans almost as soon as the Gaddys began working. There were repeated discrepancies in pay between the amounts they received and what their own records indicated they were owed. A particular problem occurred with sales for which the Gaddys provided (as directed) the local phone number answered by Boykin’s wife in Alabama. The Gaddys were not paid for a number of those sales. Joe Gaddy testified when they began leaving their personal cell phone number, they got many more *890 sales responses for which they were paid. In response, the trial court awarded the plaintiffs the amount they sought for unpaid sales.
Boykin stated he referred pay issues to McMillen. At his deposition, Boykin described his response to the Gaddys after the audit ended: “I talked to them once or twice. And then I always go to Tom (McMillen) and say, look, we did make a mistake. I’ve looked here. This is what we owe them. Or, |2fithey’re saying we owe this, but I can’t find it. You need to find out what is going on. And that’s where I leave it.” As noted previously, McMillen’s primary response was to request documentation.
An example of IMT’s unreasonable, arbitrary conduct was demonstrated in McMillen’s September 25, 2009, email to the Gaddys which stated he was still “working on the numbers. But if you guys need that last check (the amount that we show), we can send that out ASAP.” Clearly, IMT had information very soon after the audit terminated that the Gaddys were owed payments and failed to comply with their obligations to the workers.
Based upon our review of this record, we find that IMT, the employer of the Gaddys, was arbitrary and capricious in its lack of response and unnecessary delay addressing the Gaddys’ complaints about being owed pay. While the total was disputed, IMT acknowledged in September 2009 the company owed the Gaddys back-pay but failed to make any kind of tender until 3]6 months after the Gaddys’ work was no longer required. The plaintiffs are entitled to recover penalties of 90 days’ average daily pay.
DECREE
The judgment of the trial court is amended to award to plaintiffs, Joe Gaddy and Terrie Lynn Gaddy, penalty wages under La. R.S. 23:632 in the amount of $26,663.40 against their employer, International Mapping Technologies. Further, the plaintiffs are awarded attorney’s fees for this appeal in the amount of $2,500.00. In all other respects, the judgment of the trial court is affirmed. International Mapping Technologies is cast with the costs of the appeal.
AMENDED, AND AS AMENDED, AFFIRMED.

. Unfortunately, both of the Universal defendants have identical initial letters. Adding to the confusion in this record, the Gaddys referred in brief to Universal Cable Systems as “UCS” while the defendants in brief labeled Universal Collection Systems as "UCS.”

. $3,007.07 is the figure in the Gaddys’ petition. At trial, the trial court used the figure $3,043.56 as both the amount due and sum from which the award was calculated.

. In testimony and paperwork, unauthorized accounts were referred to as U/As.

. From the average daily pay figure used by the trial court, $304.53, is subtracted $18.27 (the 6% liability insurance premium for which the Gaddys were denied recovery) for a daily pay of $296.26 x 90 days’ penalty, which equals $26,663.40, the penalty under La. R.S. 23:632.

. This document was attached to the Independent Contractor Agreement between Cox Louisiana, LLC, and Universal Cable System, Inc:

Scope of work

Identify and report any and all unauthorized connections
Properly secure pedestals lock boxes, and vaults whenever possible
* Document any observed cable plant damage or locations where pedestals/lock-boxes are damaged or cannot be secured Identify and document addresses with satellite dishes
Daily reporting of previous days work
Complete and turn in U/A report daily on all U/A’s found
Attempt to make contact and directly communicate with all unauthorized accounts for sales conversions
Hang door hangers on all U/A addresses Contractor to work from 7a-7p for auditing only; after 7pm for follow-up sales until 8pm
Tagging procedure will be communicated to contractor before work begins
Sales offers will be communicated to contractor before work begins
Sales number will be communicated before work begins
Disconnects in error by contractor personnel must be reconnected by contractor personnel.
Contractor must provide Cox with contact information for the person(s) delegated with this responsibility and/or any errors related to the scope of work.
QC Review:
• Unauthorized users identified Contractor Needs:
• Tools and safety equipment needed, to be supplied by contractor with the exception of terminator tools, star keys or other system specific security tools which will be supplied by Cox)
• Materials (i.e., locks, keys, peds, traps, sales materials, supplied by Cox)
• Door hangers will be provided by Cox
• Vehicles must have magnetic signs on drivers and passengers doors stating they are a contractor for Cox (provided by Cox)